56 A.3d 631

**DYNACORP LTD., et al.**

v.

**ARAMTEL LTD., et al.**

**No. 1077, Sept. Term, 2011.**

Court of Special Appeals of Maryland.

Nov. 28, 2012.

404

408

410

412

David P. Callet (David S. Panzer, Precious M. Gittens, Greenberg Traurig, LLP, on the brief), Washington, D.C., for Appellant.

Steven E. Tiller (Albert J. Mezzanotte, Hanna Subar, Whiteford, Taylor & Preston, LLP, on the brief), Baltimore, MD, for Appellee.

Panel: HOTTEN, WATTS and CHARLES E. MOYLAN, JR., (Retired, Specially Assigned) JJ.

WATTS, J.

Appellants, Dynacorp Limited ("Dynacorp"), Moutiny Limited ("Moutiny"), and Faisal Fadul, appeal a judgment by the Circuit Court for Howard County against them in favor of appellees, Aramtel Limited ("Aramtel"), Jay Salkini, and Tecore Wireless Systems Middle East and Africa FZ–LLC ("TWS"), as to counterclaims alleging one direct claim of fraudulent inducement and seven derivative claims-for breach of contract, fraud, constructive fraud, negligent misrepresentation, breach of fiduciary duty, conversion, and usurpation of

corporate opportunity and corporate waste-as a result of a failed joint venture to provide a wireless telecommunications network in Iraq. Appellants raise four issues, which we re-phrase and reorder as follows: [1]

 I. Whether the circuit court erred in entering judgment in favor of appellees as to the direct claim for fraudulent inducement?

 II. Whether the circuit court erred in finding that appellees had standing to bring derivative claims on Moutiny's behalf against appellants?

 III. Whether the circuit court erred in exercising personal jurisdiction over Dynacorp and Fadul as to the seven derivative claims?

 IV. Whether the circuit court erred in entering judgment in favor of appellees as to the seven derivative claims?

For the reasons set forth below, we answer the first three questions in the negative. We answer the fourth question in the affirmative. We, therefore, affirm the judgment of the circuit court as to Count I, fraudulent inducement, and affirm the award of $45,089,392.81, plus interest. We vacate the judgments of the circuit court as to Count II through Count VIII, the derivative claims.

---

1. Appellants phrased the issues as follows:

 I. Whether the [c]ircuit [c]ourt's conclusion that Aramtel had proven its direct claim for fraud in the inducement (Count I) by clear and convincing evidence was legally correct where the [c]ircuit [c]ourt did not find that any of the elements had been satisfied[?]

 II. Whether Aramtel lacked standing to bring derivative claims on behalf of Moutiny (Counts II–VIII) where Section 4.1 of the April 2006 Operating Agreement precluded Aramtel from acting on behalf of Moutiny without Dynacorp's consent and Dynacorp did not consent to bringing Counts II–VIII against Appellants and TeckTel[?]

 III. Whether the Circuit Court erred in exercising personal jurisdiction over non-residents, Dynacorp, Dr. Fadul and TeckTel on Counts II–VIII[?]

 IV. Whether Counts III–VIII fail as a matter of law where the [c]ircuit [c]ourt found that Moutiny suffered no compensable damages, a required element of Counts III–V, VII and VIII, and where Maryland does not recognize the tort pled in Count VI[?]

## FACTUAL AND PROCEDURAL BACKGROUND

Because our resolution of question I involves the legal sufficiency of the evidence, we must set forth the lengthy and detailed facts of the case. The facts set forth below are summarized from testimony and exhibits introduced at trial, and the pleadings and motions filed in the case.

In 2003, after the United States invaded Iraq, much of Iraq's infrastructure, including Iraq's wireless telecommunications network, was damaged, destroyed, or obsolete. Fadul—who had been born and educated in Iraq, but immigrated to the United States in 1981—saw an opportunity to make money and "help Iraqis" by providing telecommunications. As a result, Fadul traveled to Iraq to set up a telecommunications company and work with the Ministry of Communications of Iraq (the "MOC") to operate a wireless local loop ("WLL") network.[2] In 2004, with the help of Niran Al–Hadethy, an Iraqi attorney, Fadul organized and incorporated an Iraqi company whose English name was "VitalTel" and whose Arabic name was "Al Khat Al Hayawi."[3] For at least two years, Fadul and his staff engaged in discussions with the Minister of Telecommunications of the MOC to establish a contract between VitalTel and the Iraqi Telecommunications and Post Company (the "ITPC")[4] for the license necessary to provide telecommunications in Iraq through a WLL network.

### (1) The VitalTel License

On November 27, 2005, VitalTel and the ITPC entered into a WLL Operations and Management Agreement (the "Li-

2. A WLL network provides telephone services without a land-line network.

3. Fadul testified that "al khat" means "line" and that "hayawi" means "life," "energetic," or "vital." To be incorporated in Iraq, a company is required to have an Arabic or Iraqi trade name. *See* Iraqi Law of Commerce No. 30 of 1984, Article 21.

4. According to the WLL Operations and Management Agreement dated November 27, 2005, the ITPC is "a state owned company owned 100% by the" MOC.

cense"), which permitted VitalTel to provide wireless telephone services in ten provinces in Iraq[5] for eight years with the option to renew the license for an additional eight years. Under the License, VitalTel agreed to "make investments, provide and install equipment, set up, operate and maintain the access network and provide Services in Iraq based on a WLL[ ] system[.]" VitalTel expended $2,600,000 to obtain the License, and valued the License at $75,000,000. According to Fadul, at the time VitalTel obtained the License, VitalTel lacked the funds to build the required network. As a result, Fadul began to search for investors to finance the project.

## (2) The Joint Venture

Salkini is: (1) the CEO and owner of Tecore, Inc. ("Tecore"), a telecommunications company headquartered in Columbia, Maryland, (2) the managing director and owner of TWS, a company based in Dubai, United Arab Emirates, responsible for telecommunications projects in the Middle East and Africa,[6] and (3) the director of Aramtel, a United Arab Emirates holding company that is owned by Salkini's brother and invests in telecommunications operations. In 2005, Salkini began negotiations with Fadul to invest in Vital-Tel. On December 14, 2005, Fadul sent Salkini an e-mail, attaching a document concerning VitalTel titled the "Eight Year Financial Plan" (the "Plan"). The Plan contained no restrictions or disclaimers, and projected large profits for VitalTel over the course of eight years. On December 22, 2005, Fadul sent Salkini an e-mail, attaching a document titled "Business Plan and Fiscal Infusion Analysis" (the "business model"). The business model stated that "VitalTel [was] positioned to become [t]he Verizon of Iraq[,]" and projected a net profit in excess of $1,000,000,000 by VitalTel's fifth year.

---

**5.** The ten provinces included: Baghdad, Anbar, Najaf, Karbala, Hilla, Kut, Qadasiya, Samawah, Emarrah, and De Qar.

**6.** According to Salkini, TWS subcontracts certain operations, including assembly and testing, to Tecore.

On or around January 30, 2006, Fadul sent Salkini a document, titled the "VitelTel Summary Proposal" (the "Proposal"), that outlined a business plan for VitalTel. The Proposal contained a disclaimer on the cover, stating: "This document is not meant to be relied upon by investors." The Proposal touted that "VitalTel [was] positioned to become [t]he Verizon of Iraq by installing and operating a national wireless telephone and data network in Iraq" and projected profits of over $1,000,000,000 by VitalTel's eighth year.

On February 1, 2006, Fadul sent Salkini an e-mail, stating: "Attached please find VitalTel's article of [in]corporation [from] Iraq[,]" and attached a document titled "[V]it[a]l[T]el [C]ontract." [7] The document's first page displayed the name "VitalTel" in English and VitalTel's logo and telephone number, but was otherwise in Arabic. An English translation of the document attached to Fadul's February 1, 2006, e-mail states that: (1) Fadul is the sole owner and founder of "Al–Khat Al–Hayawi," (2) the name of the company is " 'Al–Khat Al–Hayawi' (VitalTel)," [8] and (3) the company is headquartered in Baghdad, Iraq.

### (a) March 2006 Moutiny Operating Agreement ("March Operating Agreement") and Creation of Moutiny

On March 16, 2006, Aramtel and VitalTel entered into an agreement titled the "Moutiny Limited Operating Agreement" (the "March Operating Agreement"), in which the parties agreed to authorize the formation of a company known as Moutiny,[9] incorporated in the United Arab Emirates. Fadul was to serve as Moutiny's managing member and chief executive officer. Salkini signed the March Operating Agreement on behalf of Aramtel, as director, and Fadul signed the

---

7. VitalTel is also spelled "VitelTel" in the record.

8. The translated document provided by appellants states that the company's full name is "Khat–al–Hayawi Vital Tel Limited Liability Company for Public Communications Services."

9. The word "moutiny" is Arabic for "my homeland."

**418**

agreement on behalf of VitalTel, as chief executive officer. Fadul signed the March Operating Agreement for VitalTel and TeckTel [10] for the purpose of binding VitalTel and Teck-Tel. Salkini signed the March Operating Agreement for TWS for the purpose of binding TWS. The March Operating Agreement identified Moutiny's purposes, in pertinent part, as follows:

> (i) to provide [WLL] and other telecommunication services in the Republic of Iraq and elsewhere;

> (ii) to acquire, develop, exploit, sublicense, and otherwise deal in licenses, permits, and all manner of rights to provide wireless telecommunications services[.]

The March Operating Agreement contained the following language in Section 1.8:

> Enforceability of the terms of this Agreement under the laws of any Jurisdiction and the transfer of any Equipment Funds or Operating Funds (as set forth in Section 3.8(ii)) is subject to the approval of this Agreement and TWS as equipment supplier by the Republic of Iraq Ministry of Communications.

As part of the March Operating Agreement, Aramtel agreed to contribute $500,000 in cash and VitelTel agreed to contribute the License, which was valued by the parties at $500,000 and described as "that certain WLL O & M Agreement by and between [ITPC] and VitelTel, dated November 27, 2005." Aramtel agreed to lend Moutiny up to $25,000,000 to purchase telecommunications equipment from TWS and an additional $5,000,000 for operating expenses. Both Aramtel and VitalTel were to own 50% of Moutiny. Section 14.5 of the March Operating Agreement provided: "Irrespective of the place of execution or performance, this Agreement shall be governed by and construed in accordance with the laws of the United

---

10. TeckTel is an Iraqi based telecommunications company owned solely by Fadul. Fadul served as TeckTel's president. According to a document titled "Application for License Technical Submission by TeckTel, Ltd.," TeckTel was established in Iraq in June 2003, as an "Iraqi facility based telecommunications service provider."

Arab Emirates, exclusive of any conflicts of laws principles."
On March 16, 2006, the same day on which the March Operating Agreement was signed, TWS and Moutiny entered into a "Wireless System Supply Purchase Agreement" (the "March Purchase Agreement"), in which TWS agreed to sell Moutiny the equipment necessary to set up the "system."

According to Fadul, in March 2006, the ITPC declined to approve the transfer of the License from VitalTel to Moutiny and to agree to the use of TWS equipment, and the March Operating Agreement lapsed as anticipated by Section 1.8 of the March Operating Agreement. Nonetheless, Fadul and Salkini continued discussions about reaching a new agreement. On April 7, 2006, Fadul and Salkini met at Fadul's office in Virginia to discuss "getting the deal back on track[.]" At that meeting, the parties discussed the terms of a potential new operating agreement for Moutiny.

### (b) April 2006 Operating Agreement ("April Operating Agreement")

On April 12, 2006, in Columbia, Maryland, Aramtel and Dynacorp—a company owned solely by Fadul—entered into an agreement titled the "Moutiny Limited Operating Agreement" (the "April Operating Agreement"), in which the parties again agreed upon the organization of Moutiny. Salkini signed the April Operating Agreement on behalf of Aramtel, as director, and Fadul signed the agreement on behalf of Dynacorp, as director. Salkini signed the April Operating Agreement for TWS, for the purpose of binding TWS. Fadul signed the April Operating Agreement for TeckTel, for the purpose of binding TeckTel, and providing ownership of Dynacorp. As in the March Operating Agreement, Fadul was to serve as the managing member of Moutiny as well as the chief executive officer.

The April Operating Agreement provided that "the parties [ ] organized Moutiny Limited to own 100% of the ownership interests in Vit[a]lTel" and that "the parties desire to set forth and agree upon the terms and conditions governing the operation of Moutiny[.]" In Section 1.3 of the April Operating

Agreement, Moutiny's purposes are identified, in pertinent part, as follows:

(i) to own 100% of the ownership interests in Vit[a]lTel, which shall be engaged in the business of providing [WLL] and other telecommunication services in the Republic of Iraq and elsewhere; Vit[a]lTel's responsibilities shall include, but shall not be limited to, the installation, commissioning, and provisioning of all systems, operations and maintenance of all systems, and sales and marketing of [WLL] Services;

\* \* \*

The parties acknowledge and agree that the primary purpose and function of [Moutiny] is to serve as a "holding company" to own all of the ownership interests in Vit[a]lTel, and that Vit[a]lTel (and not the company) shall conduct business operations to carry out the activities specified in clause (i), above.

As to initial capital contributions, in Section 3.1 of the April Operating Agreement, Aramtel agreed to contribute $500,000 in cash. Dynacorp and/or Fadul agreed to contribute 100% of all of their ownership interests in VitalTel, valued at $500,000. The parties agreed that Aramtel and Dynacorp would each own 50% of Moutiny.

In Section 3.1 of the agreement, Dynacorp and Fadul, jointly and severally, made the following representations:

(i) Dyna[c]orp, [ ] Fadul and/or his relatives or his Affiliates own or control 100% of the ownership interests in Vit[a]lTel;

\* \* \*

(iii) Other than with respect to the License,[11] prior to the date of this Agreement, Vit[a]lTel has not conducted or

---

11. As in the March Operating Agreement, the License was defined as "that certain WLL O & M Agreement by and between the [ITPC] and Vit[a]lTel, dated November 27, 2005."

transacted business, nor has it entered into any contract or agreement with any third party;

\* \* \*

(v) Other than as set forth in paragraph (iii) above, Vit[a]lTel has no debts, obligations, liabilities or commitments to any third party or any governmental agency, and Vit[a]lTel's only asset is the License.

In Section 3.8 of the April Operating Agreement, titled "Loans," Aramtel agreed to advance $25,000,000 to Moutiny and/or VitalTel "to be used exclusively . . . to fund the purchase of telecommunications equipment from" TWS and to advance $5,000,000 to be used for operating expenses. The loan was described as "sufficient to fund Vit[a]lTel for six months to build a telecommunications system sized for 200,000 subscribers based on the business plan developed by Vit[a]l-Tel."

In Section 4.1 of the April Operating Agreement, titled "No Management Power," the parties agreed that "[n]o Member solely by virtue of being a Member may take part in the management, conduct or control of the business of [Moutiny] or have any right or authority to act for or bind [Moutiny] as a Member, except as otherwise provided in this Agreement." In Section 4.2 of the April Operating Agreement, titled "Management by Managing Member," the parties agreed that Fadul, as the Managing Member, would run the day-to-day operations of Moutiny and VitalTel and "do any and all other things . . . deem[ed] necessary or desirable in connection with the conduct of the business and affairs of [Moutiny] and/or Vit[a]lTel." In Section 4.2 of the agreement, Fadul agreed to "exercise his best efforts on behalf of [Moutiny] and Vit[a]lTel and [ ] at all times seek to enhance and promote the business interests of [Moutiny] with Vit[a]lTel."

Section 4.3 of the agreement, titled "Restrictions on Authority," restricted the Managing Member's authority, providing, in pertinent part, as follows:

With respect to [Moutiny] and its property, and Vit[a]lTel and its property, the Managing Member shall have no

authority to perform any act in violation of the Act or any other applicable laws or regulations thereunder, nor shall the Managing Member have any authority, except with the consent of the Majority of Members, to:

\* \* \*

(iii) do any act in contravention of this Agreement;

(iv) cause [Moutiny] and/or Vit[a]lTel to merge or consolidate [Moutiny] and/or Vit[a]lTel with another Person or entity, or sell all or a substantial part of [Moutiny]'s or Vit[a]lTel's assets to another Person or entity;

\* \* \*

(vi) do any act which would make it impossible to carry on the ordinary business of [Moutiny] and/or Vit[a]lTel;

\* \* \*

(viii) cause [Moutiny] and/or Vit[a]lTel to enter into, terminate, modify, amend, sublicense, transfer, or otherwise dispose or deal with the License or any other license pertaining to the business of [Moutiny] and/or the business of Vit[a]lTel.

Section 4.6 of the agreement provided as follows:

The Managing Member, [ ] Fadul, Dyna[c]orp and TeckTel, Ltd.[,] and any Affiliate of the foregoing (i) may not engage in any other wireless telecommunication business activity in the Republic of Iraq that are competitive with the wireless telecommunications business of Vit[a]lTel; and (ii) shall have the obligation to present to [Moutiny] and Vit[a]lTel any particular business opportunity relating in any such manner to the wireless telecommunication business of Vit[a]lTel in the Republic of Iraq, even if such opportunity is one which could not be advantageous to [Moutiny] or Vit[a]lTel. This restriction shall expire on November 30, 2013.

Section 14.5 of the April Operating Agreement, titled "Governing Law; Venue," provided:

Irrespective of the place of execution or performance, this Agreement shall be governed by and construed in accor-

dance with the laws of the State of Maryland, U.S.A., exclusive of any conflicts of laws principles. This Agreement has been executed in the State of Maryland, U.S.A., and the parties hereto hereby agree to resolve any disputes arising hereunder in a court of competent jurisdiction located within the State of Maryland. Each party agrees to submit to the personal jurisdiction of any such court, and further agrees that any judgment issued by any such court shall be fully enforceable in the courts or other judicial bodies of any other jurisdiction.

The April Operating Agreement differed from the March Operating Agreement in several key aspects. The March Operating Agreement was between Aramtel and VitalTel, and provided that VitalTel would transfer to Moutiny the License, which Moutiny would use to provide WLL and other telecommunication services in Iraq. In contrast, the April Operating Agreement was between Aramtel and Dynacorp, and provided that Moutiny would solely own VitalTel—the company that would provide WLL and other telecommunication services in Iraq. In the March Operating Agreement, Aramtel and VitalTel each owned 50% of Moutiny, but in the April Operating Agreement, Aramtel and Dynacorp each owned 50% of Moutiny. The March Operating Agreement was contingent upon the MOC's approval of TWS as equipment supplier, as outlined in Section 1.8, whereas the April Operating Agreement contained no such contingency.

The March Operating Agreement provided that the agreement be "governed by and construed in accordance with the laws of the United Arab Emirates," whereas the April Operating Agreement provided that the agreement be "governed by and construed in accordance with the laws of the State of Maryland," and significantly also provided that the agreement had been executed in Maryland and that the parties specifically "agree[d] to resolve any disputes arising hereunder in a court of competent jurisdiction located within the State of Maryland."

On April 12, 2006, Salkini and Fadul also executed a "Security Agreement" on behalf of Aramtel and Moutiny, respectively, with Aramtel agreeing to lend Moutiny and VitalTel $30,000,000.[12] Fadul executed a "Loan Promissory Note" (the "Note"), on behalf of Moutiny and VitalTel, promising to pay Aramtel $30,000,000, plus interest. Moutiny and VitalTel granted Aramtel a security interest in the following: (1) the License; (2) any other license that Moutiny or VitalTel obtained; (3) all of Moutiny's and VitalTel's equipment; (4) all related records; and (5) "any substitutes for and any proceeds of any of the foregoing, including insurance proceeds thereof[.]"

On the same day, the parties signed a "Wireless System Supply Purchase Agreement" (the "April Purchase Agreement"). Salkini signed the April Purchase Agreement on behalf of TWS, as managing director, and Fadul signed the agreement on behalf of Moutiny and VitalTel, as chief executive officer. After the April Operating Agreement, the Security Agreement, and the April Purchase Agreement were signed, Aramtel made the required capital contribution of $500,000 and began lending money to Moutiny for operating expenses and the purchase of equipment.

### (c) The Purported Transfer of VitalTel to Moutiny and Suspension of VitalTel's License

After the signing of the April Operating Agreement, the following events transpired with respect to Fadul's transfer of VitalTel to Moutiny. On May 12, 2006, Salkini sent an e-mail to Fadul informing him that he had signed and forwarded two Arabic documents to Fadul—one titled "Contract to Sell Shares" and another titled "Authorization." The Contract to Sell Shares provided that Fadul agreed to sell all of his shares of VitalTel to Moutiny. The Authorization, which Salkini signed on behalf of Moutiny, stated that Moutiny authorized

---

12. Although the Security Agreement states that the date of the agreement is March 12, 2006, it is undisputed that the Security Agreement was signed on April 12, 2006, the same date as the April Operating Agreement and the Loan Promissory Note.

Al–Hadethy, the legal representative of VitalTel, to sign on behalf of Moutiny "to purchase all the shares in VitalTel[.]"

On May 20, 2006, Fadul sent Salkini an e-mail in which he stated that Al–Hadethy "should complete the transaction papers of Moutiny [to VitalTel] by this week" and that she "plans to have them authenticated from the Ministry of Foreign Affairs before we FedEx them to you." On May 22, 2006, Fadul sent Salkini another e-mail with an update, stating: "I spoke today with [Al–Hadethy] and she thinks she will pick up today the completed papers from the government entity, which registers company's transactions. She also told me that she intends to take the completed paper work to the Iraqi Foreign ministry for their ratification tomorrow." On May 30, 2006, Salkini sent an e-mail to Fadul requesting an update on the "status of the share transfer of VitalTel" to Moutiny. On June 2, 2006, Fadul sent an e-mail to Salkini attaching a "Vital[T]el Document 2," which he received from Al–Hadethy. The attached document was in Arabic. The record contains no translation of the document.

A month later, on July 4, 2006, Fadul sent an e-mail to Salkini and stated: "By the way I was informed Moutiny papers were completed by the Iraqi Foreign Affairs. Where would you like me to sen[d] them to?" Salkini replied, and Fadul responded that he would have Al–Hadethy send the papers via DHL to Salkini at the Tecore address in Dubai.

On July 16, 2006, Salkini sent an e-mail to Fadul, which stated as follows:

We are very concerned that the documents for Moutiny shares transfer [from VitalTel] are still not completed. It now has been several months, and we have committed a very large amount of funding as you know. We need to have all documents by no later than July 18. Please let me know the status, and give me a call to discuss.

On July 16, 2006, Fadul responded to Salkini via e-mail:

The papers were completed and ratified by the [D]epartment of [C]ommerce and sent to you. The additional approvals you requested from the Ministry of Foreign Affairs

[were] processed as fast as humanly possible under these circumstances.... Moutiny['s] attorney will be contacted to have her FedEx the papers to TECORE address in Dubai.

On July 17, 2006, Fadul sent another e-mail to Salkini, stating the following:

Moutiny Dubai papers have been sent via DHL a few minutes ago. Here is the DHL track[ing] number: 3114949681.

Moutiny Iraq papers still within the Ministry of Interior for approval in Iraq. Moutiny['s] attorney is following up on them and as soon as I hear any[ ]thing I will let you know.

Two days later, on July 19, 2006, Salkini received an e-mail from someone named Nazih Poulos in Dubai, in which he was informed that the "Moutiny Dubai papers" had been received. On July 20, 2006, Salkini received an e-mail from Poulos with an attachment labeled "VitalTel Doc06." The attached documents were written in Arabic, but displayed the name "VitalTel" in various locations.[13] English translations of the documents, introduced into evidence as defense exhibit 34B, demonstrate that the attachment contained the following four documents: (1) "Establishment of Al–Khat Al–Hayawi (Vital Tel) For telecommunications Services, Ltd.," in which Al–Hadethy purported to submit an application to the Iraqi Business Registrar "for the purpose of registering a company in the name of 'Al–Khat Al–Hayawi' "; (2) "Completion of Process," a document from the Iraqi Ministry of Trade which certified that "the process ha[d] been completed for finalizing the sale of company shares of Al–Hayawi (VitalTel) . . . to [ ]Moutiny . . . in accordance with Corporate Law # 21"; (3) "Business Registration Certificate," a document from the Company Registrar which reflected that Moutiny owned "100%" of the shares of a company; and (4) a letter from the Iraqi Ministry of Trade to the Iraqi Ministry of Foreign Affairs with a subject line titled "Confirmation," which certi-

---

**13.** At oral argument, appellees stated that Salkini speaks and reads Arabic, and that he could read the documents attached to the July 20, 2006, e-mail.

fied that a company named "Al–Khat Al–Hayawi" was registered as an Iraqi company.

In a motion *in limine* filed by appellants pre-trial, appellants sought to exclude the transfer documentation Salkini received on July 20, 2006, at trial, and argued as follows: "[Appellees] seek to introduce the Transfer document ... as proof that ownership of a company known as 'VitalTel/Al Khat Al Hayawi' was transferred to Moutiny Ltd. However, the Iraqi Corporation Registration Office has already advised ... that [the Transfer document] is a forgery." In the motion *in limine,* appellants represented that Fadul would "testify that the actual transfer of ownership document, from VitalTel to Moutiny" was a document attached to the *in limine* motion "bearing bates-stamp FADUL000779 [defense exhibit 49]." An English translation of the document bearing bates-stamp FADUL000779 (defense exhibit 49) attached to the motion stated that Fadul, as the "authorized manager" of VitalTel, sold one million shares of VitalTel to Moutiny.

At trial, however, when asked on cross-examination whether he signed the document introduced into evidence as defense exhibit 49, Fadul testified that the signature on the document did not "resemble" his signature, and that, although the signature on the document was in Arabic, he had not signed anything in Arabic since 1980, and had not given permission to anyone to sign on his behalf. When asked on cross-examination about defense exhibit 34A, the documents sent via DHL on July 20, 2006, Fadul testified: "I do not know that they were these papers included, because I wasn't there, I instructed to complete certain papers and send them to Dubai. If these papers were in the DHL, I cannot tell you if they were or they were not." When asked if he received a copy of the papers, Fadul testified that he did not recall seeing the papers, but he discussed them—at some later point in time— with Al–Hadethy and "she did not think these were the same papers."

In a letter dated August 7, 2006, the MOC notified VitalTel that the WLL License issued to VitalTel on November 27,

2005, was no longer valid. In the letter, which was addressed to several different companies that had been granted WLL licenses-including VitalTel—the Minister of the MOC stated:

Reference to the (previous) contracts signed with you, and based on the directions of the Cabinet of Ministers for the need to first obtain their approval of these contracts, and since this approval is not present until now, these contracts are not considered valid.

Therefore, it is not allowed at the moment to implement any article in the contract related to establishment, operation, etc. until these contracts are reviewed and until we obtain the approval of the Cabinet of Ministers on that.

According to Salkini, despite the letter of August 7, 2006, Aramtel continued to make payments to Moutiny pursuant to the April Operating Agreement, and TWS continued to deliver equipment pursuant to the April Purchase Agreement. Salkini testified that he "had assurances from the Minister [of the MOC] and from Fadul specifically that the [L]icense [was] going to be reinstated, that it [was] just in suspension status, and that all the provinces that were assigned to th[e L]icense [were] going to be reinstated." According to invoices submitted to Moutiny by TWS from November 2006 to March 2007, after the License was suspended, Aramtel made payments in the amount of $9,044,712.91 on behalf of Moutiny for the equipment that was provided to Moutiny by TWS pursuant to April Purchase Agreement.

On September 17, 2006, Fadul sent an e-mail to Salkini advising that the launching date for the wireless network was estimated to be on or about January 1, 2007, and that "there [was] a need to have $500,000 in [Moutiny's] account in Iraq to cover the on[ ]going expenses."

On December 12, 2006, Fadul sent an e-mail to Salkini attaching a status report on Moutiny. In the status report, Fadul provided the following information:

The [April] Operating Agreement ... specified that Aramtel [ ] ... was to provide an aggregate of USD $5,500,000 in operating capital. To date, Moutiny has received USD

$3,500,000 in operating capital from Aramtel [ ]. An additional USD $500,000 is in transit. The remaining USD $1,500,000 has yet to be provided. A report was requested by [ ] Salkini ... before additional funds are to be made available[.]

As to the business plan and budget update, Fadul wrote: "The original business plan specified that Moutiny's WLL services would be launched in Iraq on October 1, 2006. This self imposed deadline was impossible to meet due to the license suspension letter we received from the [MOC] in August 2006.... The ensuing delay forced me to dramatically conserve operating funds." Fadul concluded the status report as follows:

I [Fadul] am sensitive to the fact that the MOC breached its legally written commitment by their letter in August. As a result, I have done everything in my power to restore the [L]icense and make this project a success....

That said, it is my belief that as soon as the amendment to the [L]icense is executed, fairness requires [Aramtel] and you [Salkini] to commit the funds necessary to fully deploy a 200,000 subscriber network.... In addition, such funding makes good business sense [ ] because it will allow Moutiny to deploy its services more quickly and be the first to render services in many areas ....

Regardless of whatever budget is made available, no efforts will be spared to have Moutiny succeed.

On December 20, 2006, Fadul sent an e-mail to Salkini, stating that, "[a]s far as the [L]icense is concerned," the Minister of the MOC had met with the Iraqi Prime Minister and he (Fadul) "was told everything was sorted out fine to approve the amendments of all WLL licenses. It is my understanding that the approval papers were left with the prime minister['s] office to sign and to then be mailed to the" MOC. On January 12, 2007, Fadul sent another e-mail to Salkini, stating: "I was advised that the prime minister['s] office has signed our papers; however, I did not get solid assurance yet. I am still not worried about this subject."

In December 2006 and January 2007, VitalTel/Moutiny's Quickbook accounts, introduced into evidence as defense exhibit 99A, demonstrate that on four occasions—December 18, 2006, and January 16, 21, and 28, 2007—Fadul withdrew money for "Cash on Hand" in the amounts of $90,000, $50,000, $50,000, and $100,000, respectively, without authorization from Aramtel.

On March 8, 2007, Moutiny held a meeting,[14] which was attended by Fadul and Salkini. The meeting's minutes state that Fadul provided an update on the status of the License and that the amended License "still ha[d] not been officially released to Moutiny."

On March 14, 2007, Fadul, representing Dynacorp, and Salkini, representing Aramtel, held a "special meeting" of Moutiny in Baltimore, Maryland. Also in attendance at the special meeting were Shiblie Shiblie (on behalf of TWS), and counsel for Aramtel and Dynacorp. The minutes of the special meeting reflect the following:

> [ ] Salkini was concerned that the [MOC] had rescinded the November 2005 license agreement between the [ITPC] and Vit[a]lTel. [ ] Fadul noted that MOC authorizes activities one day and then rescinds its authority the next week. He is lobbying within Iraq to get an amendment reinstating the [L]icense so that the network deployment can proceed. [ ] Salkini also expressed significant concern that additional costs are being incurred to build sites.

During the special meeting, the parties scheduled a date for the next progress meeting, to be held on June 1, 2007, at the Center Club in Baltimore, Maryland.[15]

---

14. The March 8, 2007, meeting's minutes do not reflect the location of the meeting.

15. According to Salkini, the June 1, 2007, meeting did not occur because "Fadul basically would not respond until the last day [and] he said he's not coming [ ] and he cancelled." Fadul testified that he "decided not to [go] to that meeting" because he did not believe it would be productive as the parties "were only fighting[.]"

On May 6, 2007, the MOC sent VitalTel a letter which stated: "We would like to inform you that the old contract regarding the extending of WLL service signed with your company has been cancelled." At some point after receiving the letter, in early May, Fadul told Salkini, during a telephone conversation, that he was not going to continue working with him and that if Salkini wanted to "continue this project, [ ] go ahead. Do it on your own. I'm out of this."

Over the weekend of May 19, 2007, Salkini met with the Iraqi Minister of Communications in Washington, D.C. At that time, the Minister told Salkini that the License issued to VitalTel "was valid and was in the process of being reinstated." On May 22, 2007, Salkini spoke with the Director General of the ITPC and was informed that the revised License "was finalized and [that] the corresponding license had been issued by the ITPC approximately ten (10) days earlier, but that it was issued to another entity or person at the direction of [ ] Fadul." (Emphasis omitted)

### (d) Al–Shams and Al Nakheel

On October 11, 2006—while Moutiny was still operating [16]— unbeknownst to Salkini, Fadul and another man, Aref Kamel Abdul Ameer (also known as Aref Al Bahash) ("Al Bahash"), presented a "Resolution license to establish a company" to the Companies Registration Department of the Ministry of Trade of Iraq. In the resolution, which was admitted into evidence at trial as defense exhibit 41, Fadul and Al Bahash requested the establishment of a company named "A[l-]Shams for wireless communications services Ltd." ("Al–Shams"). On the same day, October 11, 2006, a Company Registrar of Iraq issued a "Certificate of establishment [of] a company," confirming the establishment of Al–Shams. The certificate was signed by Al–Hadethy, Moutiny's attorney. On November 10, 2006, an application for the establishment of Al–Shams was filed with the Ministry of Trade. The Al–Shams's "[F]oundation [S]tate-

---

16. According to Fadul, Moutiny's network was not "shut down" until approximately November 12, or November 15, 2007.

ment," which was admitted into evidence at trial as defense exhibit 43, described the purpose of the company as follows: to "invest[ ] capitals in the field of national and international wireless communications[,] develop local and international communication systems aiming at creating efficient communication capable of coping with world developments." Al-Shams's meeting minutes from October 27, 2006, and November 20, 2006, admitted into evidence as defense exhibits 42 and 61, respectively, state that Fadul was a shareholder of the company.

Fadul testified that he and Al Bahash were "associated with" a company called "Al Nakheel." A document titled "Founder Resolution" dated March 13, 2007, introduced into evidence as defense exhibit 70, stated that on February 21, 2007, an establishment certificate had been issued for Al Nakheel in Iraq, and that a person named Salman Fadhil Salman was appointed as the company's commissioner director. Fadul acknowledged that Salman Fadhil Salman is his brother-in-law.

Fadul testified that, at the beginning of June 2007, Al Bahash approached him, asking about acquiring companies from him. Fadul testified that, at that time, he "turned over" two companies to Al Bahash—"Al Khat Al Hayawi for General Telecommunications Services, Limited" and "Al Berak, Limited." According to Fadul, on June 16, 2007, he signed a document, introduced into evidence as plaintiff's exhibit 336, "allowing the shares of Al Khat Al Hayawi for General Communications Services, Limited, to [be transferred] to Aref Al Bahash." Fadul testified that, at some point in June 2007, Al Khat Al Hayawi—the company conveyed to Al Bahash—obtained a license from the ITPC.[17] Fadul acknowledged that

---

17. On April 16, 2009, at a deposition, Fadul was asked whether he was involved "in any way in obtaining the license issued to Al Khat Al Hayawi" in 2007. Fadul responded: "I cannot say 'obtained'. I did aid. But I don't know whether they ultimately obtained it or not until very recently." Fadul later acknowledged at trial that Al Bahash used his (Fadul's) name, with his permission, on the license application in June or July 2007.

he did not inform Salkini about his involvement with Al Nakheel or in obtaining a license for Al Khat Al Hayawi for use by Al Nakheel. On July 9, 2007, Fadul sold all of his shares of Al Khat Al Hayawi to Al Nakheel.

On July 16, 2007, a document filed with the Department of Taxation in Iraq—introduced into evidence as defense exhibit 65—showed that Fadul sold all of his shares of "(Al Kahat Al Hayawi for Communications Services Ltd) (Moutiny)" to Al Nakheel. On October 1, 2007, at a meeting of the General Board of Al–Shams,[18] the board merged Al–Shams with Al Nakheel for the purpose of "invest[ing] capitals in the field of national and international communication; develop[ing] national and international communication systems, and aiming at creating an efficient communications capable at coping with the world developments."[19] On October 10, 2007, the Company Registrar of Iraq issued a document titled "Decision to merge limited companies," which demonstrated the merger of both "Al Khat Al hayawi for Communication Services, Ltd and Al[-]Shams for Wireless Communications Services Ltd" into Al Nakheel.

Fadul testified that, in 2008, while he was serving as the chief executive officer of Al Nakheel, he solicited investors, an act for which he was paid a commission of five percent for each investment in addition to his salary. Under an agreement with Al Nakheel, Fadul was paid a salary of $10,000 per month until the subscriber base reached 25,000 people, after which time his salary increased to $20,000 per month.[20] If the subscriber base reached 100,000 while Fadul was serving as chief executive officer, he was to receive an additional 5.4% interest in the company's equity. Fadul testified that, by July

---

**18.** The record does not disclose whether Fadul also served as a member of Al–Shams's General Board.

**19.** The General Board's meeting minutes from October 1, 2007, were introduced into evidence as defense exhibit 62.

**20.** Fadul attested to the terms of his agreement with Al Nakheel in an affidavit filed in a separate lawsuit. A copy of the affidavit was introduced into evidence at trial as defense exhibit 94.

2008, Al Nakheel had 20,000 to 25,000 subscribers and by the first half of 2009, it had 100,000 subscribers.

At trial, appellees introduced into evidence a letter dated June 28, 2009, from Imad Muhsin Si'oud, the Director General of the Legal Department for the Ministry of Telecommunication for the Republic of Iraq, indicating that the License previously issued to VitalTel had been reissued to Al Khat Al Hayawi on May 15, 2007. The letter stated, in pertinent part, as follows:

1—... [C]ontracts for deploying the wireless telephone services were signed with many companies including Al–Khat Al–Hayawi Company (Vital Tel) and the contracted conditions were amended and new contracts were signed with the same companies with the approval of the General Secretariat of the Cabinet by its letter [ ] on [April 8,]2007, the contract was signed with Vital[ ]Tel Company in 2005 and the new contract was signed with Al–Khat. Al–Hayawi which is considered the same company according to the official letters and correspondence with it on the date of signing the contract on [May 15,]2007.

2—Al[ ]Nakheel Company is working according to the contact signed with Al–Khat Al–Hayawi, since the company of Al–Khat Al–Hayawi had been merged with Al–Shams Company and changed to Al[ ]Nakheel Company according to the letter of the Ministry of Trade/Companies Registration Department ... on [November 5,]2007 and the company is still operating according to the indicated contract[.]

Hanadi Faris, an executive manager at Al Nakheel and former executive manager of Moutiny, testified that, as of the date of trial, in addition to Al Nakheel, there were five companies with contracts, or licenses, with the MOC, including: Al Khat Al Hayawi for Telecommunications Services, Al Khat Al Hayawi for Trading and Contracting, Jezan, Al–Berak, and Al–Shams. According to Faris, Al Nakheel operates in the provinces of Baghdad, Najaf, Hilla, Qadasiya, Karbala, Samawah, and Al–Basrah. Many of these provinces were previously allocated to VitalTel under the License.

### (3) Procedural History

### (a) The Complaint and Motion to Dismiss

On February 12, 2008, Dynacorp and Fadul filed a complaint in the Circuit Court for Howard County against appellees and Tecore, alleging breach of contract, promissory estoppel, breach of duty of good faith and fair dealing, fraudulent inducement, defamation and bad faith, seeking damages and a declaratory judgment that appellants were no longer obligated by the April Operating Agreement, the Note, or the Purchase Agreement.

On April 14, 2008, appellees and Tecore filed a "Motion to Dismiss and to Strike Scandalous Material from the Complaint." In a memorandum accompanying the motion, appellees advised that Aramtel had filed a separate action in the Circuit Court for Howard County against appellants for breach of the April Operating Agreement. According to appellees, in July 2007, in that case, the circuit court entered a confessed judgment in favor of Aramtel and against Moutiny and VitalTel in the amount of $28,731,302.77, the amount due pursuant to the April 12, 2006, Note signed by Fadul on behalf of Moutiny. Appellees advised that, on March 27, 2008, the circuit court denied Moutiny's and VitalTel's motion to vacate the confessed judgment.

On May 2, 2008, appellants filed an opposition to the motion to dismiss. On the same day, appellants filed a verified amended complaint, adding Moutiny as a plaintiff and omitting Tecore as a defendant. On June 2, 2008, appellees filed an answer to the verified amended complaint and a Motion to Dismiss the Verified Amended Complaint or, in the alternative, for Partial Summary Judgment. On March 20, 2009, appellees filed an amended answer to the verified amended complaint. On July 17, 2008, appellants filed an opposition to the motion to dismiss. On August 26, 2008, the circuit court held a hearing on the motion to dismiss the complaint and the Motion to Dismiss the Verified Amended Complaint or, in the alternative, for Partial Summary Judgment.

On February 10, 2009, the circuit court issued a Memorandum Opinion and Order, denying the motion to dismiss or to strike as moot in light of appellants having filed the verified amended complaint. As to the Motion to Dismiss the Verified Amended Complaint or, in the alternative, for Partial Summary Judgment, the circuit court denied the motion, in part, and granted the motion, in part. The circuit court granted the motion to dismiss as to: (1) breach of contract claims concerning the April Operating Agreement, Note, April Purchase Agreement, and Security Agreement against Salkini; (2) breach of contract claims concerning the Note and the Security Agreement against TWS; and (3) the declaratory judgment claim against all appellees.

### (b) The Counterclaim and Answer to Counterclaim

On January 27, 2009, Aramtel filed a counterclaim against Fadul and Dynacorp, alleging fraudulent inducement, fraud (intentional misrepresentation and concealment/nondisclosure), constructive fraud, and negligent misrepresentation.[21] On April 16, 2009, appellants filed an answer to the counterclaim. On May 14, 2009, appellants filed a motion to dismiss Aramtel's counterclaim for fraud in the inducement and a motion for summary judgment as to Aramtel's counterclaims for fraud, constructive fraud, and negligent misrepresentation. In the motion, appellants argued, in part, that Aramtel's counterclaims for fraud, constructive fraud, and negligent misrepresentation failed as a matter of law because they were direct actions for injuries rather than derivative actions on behalf of Moutiny. On June 1, 2009, appellees filed an opposition to the motion to dismiss and motion for summary judgment. On June 3, 2009, the circuit court denied appellants' motion to dismiss and motion for summary judgment as to Aramtel's counterclaims.

---

**21.** On February 27, 2009, appellants filed a motion to strike or, in the alternative, to dismiss the counterclaim, arguing that the counterclaim was filed late. On March 20, 2009, appellees filed an opposition to the motion. On March 27, 2009, the circuit court issued an order denying the motion to strike.

### (c) The First Amended Counterclaim and Third–Party Complaint

On May 28, 2009, Aramtel, individually and in a derivative capacity on Moutiny's behalf, filed a first amended counterclaim against Fadul and Dynacorp and a third-party complaint against TeckTel, asserting a direct claim for fraudulent inducement as Count I (against Fadul, Dynacorp, and TeckTel), and seven derivative claims, including: Count II—breach of contract, Count III—fraud, Count IV—constructive fraud, Count V—negligent misrepresentation, Count VI—breach of fiduciary duty, Count VII—conversion, and Count VIII—usurpation of corporate opportunity and corporate waste (against Fadul, Dynacorp, and TeckTel).

In Count I, fraudulent inducement, Aramtel alleged that Fadul, Dynacorp, and TeckTel falsely represented that VitalTel had been incorporated in Iraq as a public limited company, and that they "[w]ould take no actions which would make it impossible to carry on the ordinary business of Moutiny and/or Vit[a]lTel." Aramtel alleged that Fadul, Dynacorp, and TeckTel "made . . . other false and misleading statements in order to defraud Aramtel and entice it into . . . entering into the [April] Operating Agreement, the Promissory Note, and related agreements." Aramtel alleged that it relied on Fadul's, Dynacorp's, and TeckTel's representations to its detriment, and that had it known the statements were false, it would not have conducted business with Fadul, Dynacorp, and TeckTel. As a result, Aramtel sought damages in the amount of $34,047,801.18.

As to Count II, breach of contract, Aramtel alleged that Fadul, Dynacorp, and TeckTel breached the April Operating Agreement, which obligated "each to engage in certain activities for the advancement of the business interests of Moutiny and Vit[a]lTel/Al Khat Hayawi and prohibit[ed] each of them from engaging in certain activities that would impede those business interests." As to Count III, fraud, Aramtel alleged that Fadul failed to disclose several pieces of key information to Aramtel and Moutiny, and that Fadul, Dynacorp, and

TeckTel knew and made false and misleading representations for the purpose of defrauding Moutiny and Aramtel. As to Count IV, constructive fraud, Aramtel alleged that Dynacorp and Fadul owed legal, equitable, and fiduciary duties to Moutiny and Aramtel that were breached. As to Count V, negligent misrepresentation, Aramtel alleged that Fadul, Dynacorp, and TeckTel made false representations of material fact to Moutiny and Aramtel and failed to disclose other material facts. As to Count VI, breach of fiduciary duty, Aramtel alleged that Fadul, as Moutiny's Managing Member and chief executive officer, was in a fiduciary relationship with Moutiny and owed Moutiny fiduciary duties, which he breached "by failing to perform his duties with the utmost good faith and loyalty; by engaging in self-dealing to the detriment of Moutiny and its interest holders and creditors; by failing to perform his duties in a manner that was in the best interest of Moutiny; and by failing to perform his duties with the care that an ordinarily prudent person in a like position would use under similar circumstances." As to Count VII, conversion, Aramtel alleged that Fadul improperly conveyed or transferred the License from VitalTel to Al Nakheel, "without permission or justification," and that the License had a value of at least $75,000,000. As to Count VIII, usurpation of corporate opportunity and corporate waste, Aramtel alleged that Fadul's, Dynacorp's, and TeckTel's "wrongful conduct" constituted usurpation of corporate opportunity and corporate waste which caused "legal injury[.]"

### (d) The Motions to Dismiss First Amended Counterclaim and Third–Party Complaint

On June 12, 2009, Dynacorp filed a motion to dismiss the first amended counterclaim and accompanying memorandum, arguing that the first amended counterclaim failed to state a claim upon which relief could be granted and failed to allege any facts "upon which Dynacorp could be held liable for any action it took independent of [ ] Fadul ... [or] for [ ] Fadul's actions." On the same day, June 12, 2009, TeckTel filed a motion to strike, or in the alternative, dismiss the third-party

complaint and accompanying memorandum in support, arguing, in part, that it was "not subject to the jurisdiction" of the circuit court because it is an Iraq-based company with a branch in Virginia. Also on June 12, 2009, Fadul and Moutiny filed a motion to dismiss the first amended counterclaim, or in the alternative, a motion for summary judgment and accompanying memorandum of law, arguing, in part, that the first amended counterclaim failed to state a claim upon which relief could be granted, that Aramtel was contractually precluded from pursuing derivative claims, and that the circuit court lacked jurisdiction.

On June 30, 2009, appellees filed an opposition to TeckTel's motion to strike or dismiss. On July 7, 2009, appellees filed an opposition to the motion to dismiss filed by Fadul and Moutiny. On July 8, 2009, the circuit court issued an order denying the motions filed by Dynacorp, TeckTel, Fadul, and Moutiny. On July 27, 2009, appellants filed an answer to the first amended counterclaim.

### (e) The Second Amended Complaint

On June 10, 2009, appellants filed a second amended complaint. As to Count I for breach of contract regarding the April Operating Agreement, appellants modified the count to reflect that Moutiny alleged a breach of contract by Aramtel and TWS, noting that Dynacorp withdrew its claim, and that the claim against Salkini was dismissed by the circuit court. As to Count II for breach of contract regarding the Note, appellants modified the count to reflect that Moutiny alleged a breach of contract by Aramtel only, noting that the circuit court dismissed claims against Salkini and TWS. As to Count III for breach of contract regarding the April Purchasing Agreement, appellants modified the count to reflect that Moutiny alleged a breach of contract by TWS only, noting that the claim against Aramtel was withdrawn. Appellants withdrew Moutiny's claim against Aramtel for breach of contract regarding the Security Agreement contained within Count IV. Fadul's claim for tortious interference with business relationship, Count V, against all appellees remained unchanged, as

did Dynacorp's claim for fraud in the inducement, Count VI, against all appellees. Appellants noted that the circuit court dismissed Count VII for declaratory judgment for Dynacorp and Moutiny against all appellees.

In the second amended complaint, appellants added three counts: (1) Count VIII, Fadul's claim against Salkini for breach of contract and fiduciary duty; (2) Count IX, Moutiny's claim against Salkini for breach of fiduciary duty; and (3) Count X, Fadul's claim against Salkini and Aramtel for defamation. On June 30, 2009, appellees filed a motion to strike the second amended complaint or, in the alternative, motion to dismiss or for summary judgment on Counts I–III, V, and VIII–X. On July 16, 2009, appellants filed an opposition to the motion to strike.

### (4) Trial

From August 3, 2009, to August 7, 2009; August 10, 2009, to August 14, 2009; November 23, 2009, to November 25, 2009; and January 14, 15, and 19, 2010, the circuit court held a sixteen-day bench trial. On August 3, 2009, after hearing argument from the parties as to the motion to strike the second amended complaint, the circuit court ruled from the bench, granting appellees' motion to strike and dismiss Count V (Fadul's claim against all appellees for tortious interference with business relationship), Count VIII (Fadul's claim against Salkini for breach of contract and fiduciary duty), Count IX (Moutiny's claim against Salkini for breach of fiduciary duty), and Count X (Fadul's claim against Salkini and Aramtel for defamation) of the second amended complaint, and denying appellees' motion for summary judgment as to Counts I–III. On the same day, August 3, 2009, the circuit court denied appellants' oral motion for summary judgment as to Counts II–VIII of the first amended counterclaim. On August 11, 2009, at the conclusion of appellants' case, appellees orally moved for judgment. The circuit court denied the motion.

On November 25, 2009, the circuit court denied appellants' motion for judgment as to the first amended counterclaim and reserved ruling on appellees' motion for judgment. On Janu-

ary 19, 2010, at the conclusion of all of the evidence in the case, appellants moved for judgment and appellees renewed their motion for judgment. The circuit court denied both motions. The circuit court instructed counsel for the parties to submit closing arguments in writing within sixty days.

On April 27, 2010, appellees filed "Proposed Findings of Fact and Conclusions of Law" and a "Brief in Support of Their Proposed Findings of Fact and Conclusions of Law." On the same day, appellants filed a "Joint Post Trial Memorandum" accompanied by "Proposed Findings of Fact" and "Proposed Conclusions of Law." On May 27, 2010, appellees filed a rebuttal to appellants' proposed findings of fact and a "Rebuttal Brief in Support of Their Proposed Findings of Fact and Conclusions of Law." On the same day, appellants filed a "Joint Post Trial Memorandum Replying to and Rebutting Memorandum of [Appellees]" and supplemental proposed findings of fact.

**(5) The Circuit Court's Order and Memorandum Opinion**

On June 21, 2011, approximately thirteen months after receipt of the last post-trial filing, the circuit court issued a Memorandum Opinion and Order finding against appellants as to each of their claims, finding in favor of appellees to each of its claims, and ordering appellants to pay appellees damages in the amount of $41,637,099.46. In the Memorandum Opinion, the circuit court ruled, in pertinent part, as follows:

**JURISDICTION**

The Court finds that Aramtel's shareholder derivative claims are properly within the Court's jurisdiction. [Appellants] raise the issue of jurisdiction for [the] first time in their post-trial memorandum. Specifically, [appellants] assert that this Court does not have personal jurisdiction over Fadul and Dynacorp regarding Aramtel's derivative claims brought on behalf of Moutiny. [Appellants] propose this argument even after initiating the instant suit in the Howard County Circuit Court. This Court finds that [appellants] waived the defense of lack of personal jurisdiction,

and that the exercise of personal jurisdiction over [appellants] is constitutionally reasonable.

Pursuant to Maryland Rule 2–322, the defense of lack of jurisdiction over the person "shall be made by motion to dismiss filed before the answer, if an answer is required." The rule definitively states that if this defense is not raised in a motion to dismiss, and instead an answer is filed, the defense is waived. Maryland Rule 2–322. While Fadul and Dynacorp filed a Motion to Dismiss on other grounds, they failed to raise the defense of lack of personal jurisdiction. TeckTel raised the defense of lack of personal jurisdiction in a Motion to Dismiss on July 8, 2009, but this Court denied TeckTel's motion, finding that this Court did have personal jurisdiction over Tecktel. Because [appellants] failed to file a Motion to Dismiss asserting lack of jurisdiction over the person, and instead filed an Answer, [appellants] waived this defense. Furthermore, [appellants] initiated the instant lawsuit in Maryland and therefore cannot avoid the jurisdiction of this Court.

Fadul, Dynacorp and Tecktel contractually consented to the jurisdiction of this Court. According to Section 14.5 of the Operating Agreement:

"This Agreement has been executed in the State of Maryland, U.S.A., and the parties hereto hereby agree to resolve any disputes arising hereunder in a court of competent jurisdiction located within the State of Maryland. Each party agrees to submit to the personal jurisdiction of such court, and further agrees that any judgment issued by any such court shall be fully enforceable in the courts or other judicial bodies of any other Jurisdiction."

[Appellants] argue that because Moutiny did not enter into the contract, Moutiny cannot be subject to personal jurisdiction in Maryland. However, this Court finds that because Moutiny was created as a result of the Operating Agreement, it is bound by its terms.

This Court further finds that even if Fadul, Dynacorp and Tecktel had never contractually consented to the jurisdic-

tion of this Court, this Court would still have personal jurisdiction over them under a constitutional analysis. The Court must engage in a two-step analysis to determine whether it has personal jurisdiction over a party. The court must consider whether personal jurisdiction is permissible under the State's long-arm statute, and whether personal jurisdiction complies with due process under the federal constitution. *Beyond Systems, Inc. v. Realtime Gaming Holding Co.*, 388 Md. 1, 14–15 [878 A.2d 567] (2005).

\* \* \*

In this case, Fadul, Dynacorp and Tecktel signed two separate operating agreements in Maryland involving the telecommunications project in Iraq. Both operating agreements state that these agreements were executed in the state of Maryland. Throughout the negotiation process Fadul frequently corresponded with [ ] Salkini, David Claburn, Shiblie Shiblie and Haider Thamir, who were living in Maryland at the time. Fadul also attended numerous meetings in Maryland to discuss the joint venture. Based on the frequent contacts that Fadul had in the state of Maryland, this Court finds that [appellants] had the requisite minimum contacts to justify personal jurisdiction in Maryland.

## STANDING

This Court also finds that Fadul lacks standing to bring claims on behalf of Moutiny in this lawsuit. Pursuant to the operating agreement, Fadul was the managing member of Moutiny, and was in charge of overseeing the day-to-day management. However, during the hearing on March 27, 2008, Fadul testified that he had withdrawn as managing member of Moutiny[.]

\* \* \*

Because Fadul is no longer the managing member of Moutiny, he lacks the authority to act on its behalf, and therefore has no standing to authorize Moutiny to bring claims in this lawsuit.

Fadul has also lost his status as managing member of Moutiny because he was concurrently serving as the CEO of a competing company, Al Nakheel, beginning in February 2008.

\* \* \*

Dynacorp also does not have standing to authorize Moutiny to bring claims in this case. According to the Operating Agreement, any action required consent of the majority of the members, which was defined as members that own 75% of the interest in the company. The Operating Agreement set out that Dynacorp owned 50% of Moutiny and Aramtel owned the other 50%. Because Dynacorp has less than 75% interest in Moutiny, it does not have the authority to take action without Aramtel's consent. Aramtel did not consent to Moutiny bringing claims against it in the instant lawsuit, and therefore Dynacorp does not have standing to assert claims on behalf of Moutiny.

No authority exists under Maryland Corporate law that authorizes Moutiny to pursue this litigation unilaterally, without consent of the majority of members. According to Maryland law, a director may not act on behalf of a corporation without authority from the rest of the board. . . . Because Fadul and Dynacorp did not act on behalf of Moutiny without approval from Aramtel, Moutiny does not have standing to bring the claims asserted in the instant lawsuit.

## ANALYSIS

\* \* \*

### II. Claims Asserted by [ ] Aramtel and Salkini

\* \* \*

*B. Aramtel's Derivative Claim for Fraud and Intentional Misrepresentation and Concealment/Non–Disclosure*

This Court notes that [appellants] failed to call Ms. Niran Al–Hadethy as a witness at trial. Ms. Hadethy was legal counsel for Fadul, TeckTel, Moutiny, VitalTel, Al Khat Al Hayawi, and Al[-]Shams, and continues to serve in such

capacity for Al Nakheel. Ms. Hadethy's testimony would have been material to this case and may have resolved many of the issues in dispute.

* * *

Given [appellants'] failure to offer this critical witness [Al–Hadethy] at trial, the Court can reasonably infer that Ms. Hadethy would testify to the following: . . . (3) VitalTel and Al Khat Al Hayawi are not different companies, but are, in fact, the same company—VitalTel being the company's English name and Al Khat Al Hayawi being the company's Arabic name; (4) After the April Operating Agreement was executed, she was asked by Fadul to effectuate the transfer of all of the shares of VitalTel (Al Khat Al Hayawi) to Moutiny; (5) The documents that comprise [Defense Exhibit] # 34A are the documents that were sent to Salkini . . . to establish that 100% of the shares of VitalTel (Al Khat Al Hayawi) has been successfully transferred to Moutiny and that Moutiny was the sole owner of VitalTel[.]

* * *

This Court finds that Moutiny and Aramtel relied on Fadul's false misrepresentations and material omissions. Based on Fadul's representations that VitalTel and its license had been transferred to Moutiny, Aramtel continued to loan significant sums to Moutiny and Moutiny continued to incur significant debt. Fadul failed to offer into evidence any document demonstrating that VitalTel was transferred to Moutiny in accordance with the April Operating Agreement. It can reasonably be inferred that Aramtel would have stopped loaning money to Moutiny if Fadul [had] not sent the allegedly fraudulent share transfer documents. . . .

**This Court draws negative inferences from Fadul's failure to introduce documents into evidence that would have supposedly existed if Fadul's version of the events were truthful.** This Court finds that the following documents are conspicuously missing from the Court record: (1) Articles of [I]ncorporation or other documents from Al Khat Al Hayawi; (2) documents from the Iraqi Company Regis-

trar for VitalTel or Al Khat Al Hayawi; **(3) Any documents showing that VitalTel was transferred to Moutiny;** (4) Correspondence from the Company Registrar informing VitalTel that it was not properly registered; (5) Any of the license applications that Fadul prepared that would demonstrate that Al Khat Al Hayawi and VitalTel are different entities; (6) Any of the licenses under which Al Nakheel is operating, including the license received by Al Khat Al Hayawi; (7) The power of attorney that [Fadul] gave to Ms. Hadethy; and (8) Any record of communications that Fadul had with Ms. Hadethy.

\* \* \*

*H. Aramtel's Direct Claim for Fraud in the Inducement*

This Court finds by clear and convincing evidence that Fadul perpetrated a fraud on Moutiny. On February 1, 2006, Fadul sent an e-mail to Salkini with a copy of VitalTel/Al Khat Al Hayawi's formation papers. Fadul specifically stated: "Attached please find VitalTel's articles of [in]corporation" from Iraq.[ ] The attachment to the email included several formation documents that led Salkini to believe that VitalTel had been properly formed and incorporated under its Arabic name, Al Khat Al Hayawi. While this Court does believe that Fadul planned to set up the joint venture in good faith from the beginning, this Court ultimately finds that Fadul committed a fraud in the inducement.

## DAMAGES

This Court finds that Aramtel initially invested five hundred thousand dollars ($500,000.00) in Moutiny and then promised to loan five million dollars ($5,000,000.00) to be used for operating expenses. Aramtel then loaned Moutiny twenty-five million dollars ($25,000,000.00) to be used to fund the purchase of telecommunications equipment from TWS. This Court therefore finds that Aramtel suffered $30,500,000.00 in damages, and Orders Fadul to compensate

Aramtel for its investment by repaying this amount plus interest.

In determining the proper measure of damages in fraud and deceit cases, Maryland applies the "flexibility theory." . . . Under this "flexibility theory", a victim of fraudulent or negligent misrepresentation may elect to recover "out-of-pocket" expenses or "benefit-of-the-bargain" damages. Moutiny was deprived the benefit of its bargain as a result of Fadul's fraudulent scheme and many violations of his contractual and fiduciary duties. Because the future profits of Moutiny are unknown, this Court will not [o]rder damages based on the loss of ownership of the WLL license, the lost profits or the benefits Fadul received from the Al Nakheel opportunity. While Moutiny may have successfully deployed the WLL network in Iraq if it had the WLL license, it still may have failed for numerous other reasons. Because [appellees] cannot prove Moutiny's profits with certainty, this Court cannot make a determination as to the potential damages.

The section titled "Interest" of the Loan Promissory Note provides that interest accrues on the outstanding unpaid balance of the loans at "a per annum rate of twelve percent (12%)" and that such interest "shall be computed on the basis of a 365–day year and the actual number of days elapsed.["] The preamble to the note states that the outstanding principle of the loan "shall be due and payable on January 2, 2013" and that interest on the outstanding balance "shall be due and payable on the first day of each calendar quarter beginning on January 1, 2008 and ending on January 1, 2013[.]"

At the March 2007 Members' Meeting, the parties agreed that interest on the operating expense loan would be calculated "from the day funds are paid by Aramtel to Moutiny" which date "will be deemed to be the day the funds arrived in an account in Moutiny's name." Based on this information, this Court orders [appellants to] pay [appellees] $11,137,099.46 in interest in addition to the $30,500,000.00, resulting in a total of $41,637,099.46.

## CONCLUSION

This Court finds that [ ] Dynacorp and Moutiny have not met their burden in proving that [appellees] are liable on any of the four remaining counts of [appellants'] Second Amended Complaint. This Court finds [appellees]' claims to have merit, and Orders that [appellants] pay [appellees] $41,637,099.46 in damages.

(Emphasis added).

### (6) Post–Trial Motions

On July 5, 2011, appellees filed a motion to amend judgment, requesting that the circuit court amend the judgment to include interest through the date that the circuit court's order is paid in full. According to appellees, in calculating the judgment, the circuit court failed to account for the accrual of daily interest at the rate of $8,161.45 between April 27, 2010, the last day for which interest was awarded in the circuit court's order, and June 24, 2011, the date of the circuit court order. As such, appellees requested that an additional $3,452,293.35 be added to the judgment, and that the judgment be amended to include an award of $8,161.45 for each day that the judgment amount is unpaid. On July 20, 2011, appellants filed an opposition to the motion to amend judgment. On the same day, appellants—Fadul, Dynacorp, and Moutiny—noted an appeal of the judgment in the amount of $41,637,099.46. TeckTel was not named as an appellant in the notice. On August 12, 2011, the circuit court granted appellees' motion to amend and issued an amended order—increasing the amount of the judgment to $45,089,392.81, plus interest at a per diem rate of $8,161.45 beginning June 24, 2011. On August 25, 2011, appellants—Fadul, Dynacorp, and Moutiny—noted an appeal of the judgment in the amount of $45,089,392.81. TeckTel was not named as an appellant in the notice.

On August 26, 2011, appellees filed a "Motion to Revise Judgment Pursuant to M[aryland] Rule 2–534" and accompanying memorandum seeking: (1) an award of attorneys' fees;

(2) punitive damages; (3) that Fadul be required to disgorge his ownership interest in Al Nakheel and any other benefits he received as a result of stealing Moutiny's corporate opportunity; and (4) compensatory damages equal to the value of the License. On September 13, 2011, appellants filed a memorandum in opposition. On December 19, 2011, the circuit court denied the motion.[22]

## DISCUSSION

## I.

## Fraudulent Inducement

### (1) Contentions

Appellants contend that the circuit court erred in entering judgment in appellees' favor as to the claim for fraudulent inducement. Appellants argue that the "evidence was insufficient as a matter of law to satisfy each of the necessary elements" of fraudulent inducement. As to the element of false representation, appellants assert that "there [was] no basis to find that [ ] Fadul's February 1, 2006 representation to Aramtel regarding the corporate formation of VitalTel was false." Appellants argue that the circuit court expressly found that "the documents attached to [ ] Fadul's February 1, 2006 e[-]mail were, in fact, VitalTel's actual formation papers and correctly reflect that the company's Arabic name is Al Khat Al Hayawi." As to the elements of knowledge of falsity, the purpose of defrauding, and reliance, appellants maintain that the circuit court failed to make specific findings. As to the element of reliance, and the right to rely on the false representation, appellants assert that "the [c]ircuit [c]ourt's finding

---

**22.** The circuit court docket included in the record extract reflects that, on November 7, 2011, the circuit court held a hearing on the "Motion to Revise Judgment Pursuant to M[aryland] Rule 2–534," and that the circuit court was "to issue [a] written decision[.]" Nothing in the record or record extract reflects whether the circuit court granted or denied the motion. Appellants state, on brief, however, that "[o]n December 19, 2011, the [c]ircuit [c]ourt denied Aramtel's Motion to Revise Judgment."

that [ ] Fadul committed a [fraudulent] inducement is inconsistent with its finding that Section 14.2 of the April [Operating] Agreement—the 'integration clause'—precluded a party from relying on representations that were not incorporated into the written April Agreement."

As to causation of actual damages, appellants maintain that "Aramtel did not suffer compensable injury as a result of [ ] Fadul's alleged misrepresentation." Appellants argue that "the [c]ircuit [c]ourt erroneously ordered [ ] Fadul to 'repay' mon[ies] . . . loaned by Aramtel to Moutiny and VitalTel, [ ] where Aramtel expressly agreed that, as a condition to get [ ] Fadul to sign the April Agreement, [ ] Fadul would not be liable on the up to $30 million loan[.]'" (Emphasis omitted). Appellants assert that "Aramtel has not suffered a compensable injury due to [ ] Fadul's alleged misrepresentation because the [c]ircuit [c]ourt found Moutiny 'may have failed for numerous other reasons.'" (Footnote omitted).[23]

Appellees respond that they "presented clear and convincing evidence that [appellants] fraudulently induced [appellees] into entering the [April] Operating Agreement." Appellees contend that appellants knowingly made false representations to them for the purpose of defrauding appellees. Specifically, appellees argue that "Aramtel presented sufficient evidence from which the [c]ircuit [c]ourt was able to infer either that Fadul actually knew that VitalTel/Al Khat Al Hayawi was not properly incorporated prior to entering into the Operating Agreement, or that Fadul made the statements regarding

---

**23.** In arguing that the evidence was insufficient to support the judgment in appellees' favor as to the claim for fraudulent inducement, appellants contend that the circuit court: (1) "confused the parties" in concluding that "Fadul perpetrated a fraud on Moutiny" rather than Aramtel, and (2) entered orders that "are apparently inconsistent with the [j]udgment it entered" because the circuit court ordered Dynacorp and Fadul to pay Aramtel and Moutiny, but entered judgment only as to Aramtel in favor of Dynacorp, Fadul, and TeckTel. Appellees respond that, in context, "the reference to 'Moutiny' was intended to [refer] to 'Aramtel[,]'" and "this inadvertent mistake . . . does not alter" the circuit court's order. We agree with appellees that these circumstances do not affect the content of the circuit court's June 21, 2011, Order nor merit reversal.

VitalTel's proper formation with reckless indifference to their truth." Appellees maintain that judicial estoppel and equitable estoppel prevent appellants from contending on appeal that VitalTel and Al Khat Al Hayawi were the same company after contending in the circuit court that VitalTel and Al Khat Al Hayawi were two different companies.

In a reply brief, appellants contend that judicial estoppel does not apply because the circuit court did not accept appellants' position that VitalTel and Al Khat Al Hayawi were two different companies. Appellants argue that equitable estoppel does not apply because appellees did not rely on, but rather disputed, appellants' position.[24]

### (2) Standard of Review

■ An appellate court reviews a trial court's factual findings for clear error, and reviews the trial court's legal conclusions *de novo.* *See* Md. R. 8–131(c) (An appellate court "will not set aside the judgment of [a] trial court on the evidence unless clearly erroneous, and will give due regard to the opportunity of the trial court to judge the credibility of the witnesses."); *Ramlall v. MobilePro Corp.,* 202 Md.App. 20, 34, 30 A.3d 1003 (2011) ("The clearly erroneous standard does not apply to [a trial] court's legal conclusions, however, to which [an appellate court] accord[s] no deference and which [the appellate court] review[s] to determine whether [or not] they are legally correct."). The appellate court views the evidence in the light most favorable to the prevailing party, *City of Bowie v. MIE Props., Inc.,* 398 Md. 657, 676, 922 A.2d 509 (2007), and resolves all evidentiary conflicts in the prevailing party's favor. *First Union Nat'l Bank v. Steele Software Sys. Corp.,* 154 Md.App. 97, 107 n. 1, 838 A.2d 404 (2003), *cert. denied,* 380 Md. 619, 846 A.2d 402 (2004).

---

**24.** In a reply brief, appellants contend that, by "fail[ing] to respond to the arguments in [a]ppellant's [b]rief[, appellees have] conced[ed that appellants] caused no compensable injury to Aramtel." Although we would discourage appellees in general from not addressing issues that are raised on appeal, we decline appellants' invitation to treat appellees' silence as a concession in the instant case.

### (3) Law

In *First Union Nat'l Bank, id.* at 134, 838 A.2d 404, this Court listed the five elements of fraudulent inducement, stating:

To entitle the plaintiff to recover it must be shown [by clear and convincing evidence]: (1) that the representation made is false; (2) that its falsity was either known to the [defendant], or the misrepresentation was made with such a reckless indifference to truth as to be equivalent to actual knowledge; (3) that it was made for the purpose of defrauding the [plaintiff]; (4) that [the plaintiff] not only relied upon the misrepresentation, but had a right to rely upon it in the full belief of its truth, and that [the plaintiff] would not have done the thing from which the injury resulted had not such misrepresentation been made; and (5) that [the plaintiff] actually suffered damage directly resulting from such fraudulent misrepresentation.

(Citation omitted).

In *First Union Nat'l Bank, id.* at 170, 136, 838 A.2d 404, this Court held that the evidence, viewed in its entirety, fell short of establishing fraudulent inducement. We concluded that: (1) the defendant's "intentions regarding [a] 'best efforts' clause were not sufficient to show the scienter necessary to prove fraudulent intent not to perform, [as the] clause was ambiguous, and the parties did not discuss what it meant[,]" (2) the defendant's other "representations [ ] could not be reasonably relied on in this commercial transaction because they contradict[ed] the express terms of the" agreement, and (3) the defendant's other "representations [were] so broad and vague that they are not actionable misrepresentations, and fall within the category of 'puffing.'" *Id.* at 136, 838 A.2d 404. The plaintiff, "a settlement service company," contracted with the defendant, a bank, to provide "a new, centralized and automated system for obtaining title searches and appraisals for home equity loans." *Id.* at 107, 838 A.2d 404. Because the parties did not discuss the contract's "best efforts" clause, we concluded "the jury could not reasonably infer [ ] fraudulent intent **simply** from [the defendant's representative] saying

that he never intended to refer [the plaintiff] more than 50%" of the defendant's business. *Id.* at 147, 838 A.2d 404. The plaintiffs could not reasonably rely on the defendant's "statements about a 'long term mutually beneficial relationship' ... [because they were] so vague and general as to be incapable of particular application." *Id.* at 164, 838 A.2d 404 (citation and some internal quotation marks omitted).

In *First Union Nat'l Bank, id.* at 149, 838 A.2d 404, the plaintiff contended that the defendant's "immediate breach of the contract, without a change in circumstances, together with [the defendant's] subsequent conduct" demonstrated a fraudulent intent. Although we rejected the plaintiff's contention on appeal, concluding that the defendant had engaged in "meaningful partial performance" and that a "significant change in circumstances" occurred after signing the contract, we discussed the breach of contract and subsequent conduct as evidence of fraudulent intent as follows:

> A fraudulent pre-existing intent not to perform a promise made cannot be inferred from the failure to perform the promise alone. But, it may be considered with the subsequent conduct of the promisor and the other circumstances surrounding the transaction in sustaining such an inference. And it has been stated that **under certain conditions, a failure or refusal to perform is strong evidence of an intent not to perform the promise at the time it was made,** as where only a short period of time elapses between the making of the promise and the failure or refusal to perform it, and there is no change in the circumstances.

*Id.* (emphasis added) (quoting *Tufts v. Poore,* 219 Md. 1, 10, 147 A.2d 717 (1959)). In *Tufts,* 219 Md. at 10–11, 147 A.2d 717 a case involving circumstantial evidence of fraudulent intent based, in part, upon the party's subsequent conduct, the Court of Appeals discussed the valuation of facts related to demonstrating fraudulent intent, stating:

> In valuing facts relating to the question of a present intention not to perform a promise made, courts have frequently stressed the importance and significance of the situation of the parties, the relations existing between them, the activity

of the promisor in procuring the instrument, and the failure of the promisor to perform.

As to fraudulent inducement, in *Goldstein v. Miles*, 159 Md.App. 403, 437, 859 A.2d 313 (2004), *cert. denied*, 384 Md. 581, 865 A.2d 589 (2005), this Court held that the plaintiffs "failed to produce sufficient evidence that they reasonably relied upon [the defendant]'s representations" because the defendant's "statements were too indefinite, vague, and general to be considered as anything more than expressions of expectation or probability and therefore [were] not actionable as fraudulent ... misrepresentations." The defendant, a lawyer, had stated that, upon his retirement, he would sell his law firm below market value to the plaintiffs, also lawyers. *Id.* at 436, 859 A.2d 313. We concluded that the plaintiffs could not reasonably rely on the defendant's statements, which "did not contain any material terms of the sale. No purchase price, date of sale, interest rate, or terms of payment were discussed, much less agreed upon." *Id.* at 437, 859 A.2d 313.

### (4) Analysis

### (a) Grounds for Establishing Fraudulent Inducement

██ Returning to the instant case, although we ultimately reach the same conclusion as the circuit court—that appellants fraudulently induced appellees—we decide the issue of sufficiency of the evidence for fraudulent inducement on grounds that differ from those of the circuit court, which held that appellants fraudulently induced appellees by representing that VitalTel had been properly incorporated as Al Khat Al Hayawi.[25] We explain.

The circuit court concluded that on February 1, 2006, Fadul sent an e-mail to Salkini that served to fraudulently induce

---

25. An appellate court may consider grounds that differ from a trial court's. *See Yaffe v. Scarlett Place Residential Condo.*, 205 Md.App. 429, 440, 45 A.3d 844 (2012) ("[A]lthough an appellate court will not ordinarily consider an issue that was not previously raised in the trial court, an appellate court can affirm when the record in a case adequately demonstrates that the decision of the trial court was correct, although on a ground not relied upon by the trial court and perhaps not

Salkini to enter into the April Operating Agreement. The e-mail read, in pertinent part: "Attached please find VitalTel's article of [in]corporation [from] Iraq." One of the e-mail's attachments—which has since been translated into English—reads, in pertinent part: "I, company registrar, certify herein that on [June 13, 2004], [Al–Khat Al–Hayawi Telecommunications Services, Ltd.] was registered in our books[.]" [26]

At trial, Fadul contended that VitalTel and Al Khat Al Hayawi were two different companies—thus, Fadul could convey "VitalTel" to Moutiny and "Al Khat Al Hayawi" to Al Bahash. The circuit court found that Fadul was not a credible witness. The circuit court rejected Fadul's contention and concluded that "VitalTel" and "Al Khat Al Hayawi" were the same company—which Fadul purported to convey to Moutiny, when in fact he actually conveyed VitalTel to Al Bahash. We agree with these conclusions by the circuit court.

The conclusion that VitalTel and Al Khat Al Hayawi were the same company, however, means that Fadul did **not** make a

---

even raised by the parties. In other words, we can affirm when the trial court's decision was right for the wrong reasons. Considerations of judicial economy justify the policy of upholding a trial court decision which was correct although on a different ground than relied upon." (Citations and internal quotation marks omitted)). Pursuant to Maryland Rule 8–131(c), an appellate court "will not set aside the judgment of the trial court on the evidence unless clearly erroneous, and will give due regard to the opportunity of the trial court to judge the credibility of the witnesses." In *Fischer Org., Inc. v. Landry's Seafood Rests., Inc.*, 143 Md.App. 65, 72, 792 A.2d 349 (2002), after stating the standard of review set forth in Maryland Rule 8–131(c), we stated:

> If, in considering the evidence produced at trial in the light most favorable to the prevailing party, an appellate court determines that there is sufficient evidence to support the judgment of the trial court, it will not be disturbed. Moreover, if there is any competent, material evidence to support the factual findings below, we cannot hold those findings to be clearly erroneous.

(Citation and internal quotation marks omitted).

**26.** At trial, Fadul denied that he added the attachment to his February 1, 2006, e-mail to Salkini. Fadul, however, failed to offer into evidence any other documentation that purported to be VitalTel's incorporation papers.

false representation in purporting to attach VitalTel's incorporation papers to Fadul's February 1, 2006, e-mail to Salkini. It is undisputed that VitalTel **was** properly incorporated under the Arabic name "Al Khat Al Hayawi." Fadul, however, testified that "VitalTel" and "Al Khat Al Hayawi" were two different companies. Thus, in Fadul's February 1, 2006, e-mail to Salkini, Fadul made a representation—that VitalTel and Al Khat Al Hayawi were the same company—about which he later testified differently. Yet, the representation was actually true.

Within this litigation, appellants have taken inconsistent positions as to whether or not "VitalTel" and "Al Khat Al Hayawi" were two different companies. At trial, appellants contended that "VitalTel" and "Al Khat Al Hayawi" were two different companies. Fadul did so to argue that Moutiny did not own "Al Khat Al Hayawi," which he could thus convey to Al Bahash. On appeal, appellants contend that "VitalTel" and "Al Khat Al Hawayi" were the same company. Appellants do so to argue that Fadul's representation to Salkini via the February 1, 2006, e-mail—that VitalTel was incorporated under the Arabic name "Al Khat Al Hawayi"—was true.

In the interests of justice, although Fadul should not benefit from his own disingenuousness, we need not reach the parties' contentions regarding the applicability of the principles of equitable estoppel or judicial estoppel. We find sufficient evidence of fraudulent inducement on grounds that differ the circuit court's. **We conclude that Fadul's false representation was his promise in the April Operating Agreement to convey VitalTel to Moutiny—which the evidence established he not only failed to do, but also never intended to do—*not* his representation to Salkini via the February 1, 2006, e-mail that VitalTel was incorporated under the Arabic name "Al Khat Al Hayawi."** We address the five elements of fraudulent inducement, and conclude that the evidence establishes that Fadul fraudulently induced appellees to invest $500,000 in, and loan $30,000,000 to, Moutiny by falsely representing that Fadul would convey VitalTel to Moutiny.

### (b) The Five Elements of Fraudulent Inducement

### (i) False Representation and Knowledge of Falsity or Reckless Indifference to Truth

■ The falsity of Fadul's representation—*i.e.* that he would convey ownership of VitalTel to Moutiny—and his pre-existing fraudulent intent are demonstrated by Fadul's conduct both prior to executing the April Operating Agreement and his subsequent conduct in failing or refusing to perform under the agreement. *See First Union Nat'l Bank*, 154 Md.App. at 149, 838 A.2d 404 ("A fraudulent, pre-existing intent not to perform a promise ... may be considered with the subsequent conduct of the promisor and the other circumstances surrounding the transaction ... [including] a failure or refusal to perform[.]" (Citation omitted)).

■ Key differences in the March and April Operating Agreements provide circumstantial evidence of the falsity of Fadul's representation and intent that he would transfer ownership of VitalTel to Moutiny. The March Operating Agreement provided that VitalTel would transfer ownership of the License directly to Moutiny and contained no mention of Dynacorp. In contrast, the April Operating Agreement provided that Dynacorp and/or Fadul would transfer ownership of VitalTel to Moutiny. Thus, the parties agreed that the License would not be directly transferred to Moutiny, but rather ownership of a company, known by Fadul to exist under two names-VitalTel in the United States and Al Khat Al Hayawi in Iraq-would ostensibly be transferred to Moutiny. With the April Operating Agreement, a new agreement was created that permitted Fadul to identify VitalTel and Al Khat Al Hayawi as the same company to Salkini but, unbeknownst to Salkini, transfer ownership of Al Khat Al Hayawi and the License to Al Nakheel. This outcome would not have been possible under the March Operating Agreement.[27] Although

---

27. Indeed, Section 1.8 of the March Operating Agreement stated that enforceability of the agreement was conditional on "approval of th[e] Agreement and TWS as equipment supplier" by the Iraqi government.

the record is devoid of explicit information that Fadul insisted on the changes in the April Operating Agreement, as appellants acknowledged at oral argument, the agreement was the product of negotiations between Fadul and Salkini, and the April Operating Agreement culminated in far more favorable terms to Fadul and Dynacorp than to appellees. A plaintiff satisfies the elements of false representation and knowledge of falsity where circumstantial evidence establishes that a defendant makes a promise without intending to perform. *See First Union Nat'l Bank,* 154 Md.App. at 159, 838 A.2d 404 ("[F]raudulent intent can be inferred from circumstantial evidence[.]" (Citations omitted)); *id.* at 134, 838 A.2d 404 ("[A] person may commit fraud if he or she enters an agreement to do something, without the present intention of performing[.]" (Citation omitted)).

In this case, the requirement that Fadul transfer ownership of VitalTel to Moutiny was not ambiguous. On April 12, 2006, pursuant to Section 3.1(ii) of the April Operating Agreement, Dynacorp and/or Fadul agreed to contribute to Moutiny "100% of all of the ownership interests in Vit[a]lTel." VitalTel was the only asset that Fadul was to invest in Moutiny. An examination of the April Operating Agreement, and the requirement in Section 3.1(ii) that ownership of VitalTel be transferred to Moutiny, demonstrates the significance of the requirement. The third paragraph of April Operating Agreement clearly provides: "**WHEREAS,** the parties have organized Moutiny [ ] to own 100% of the ownership interests in Vit[a]lTel, an Iraq public limited company[.]" (Emphasis in

---

At trial, Fadul testified that the Iraqi government declined to approve the transfer of VitalTel's License to Moutiny or to agree to the use of TWS equipment. Fadul presented no documentation, at trial, however, that would confirm the lack of approval from the Iraqi government of the transfer of the License to Moutiny or the use of TWS as equipment supplier. Thus, as to the disapproval, we have only Fadul's word on the matter. Interestingly, at trial, Salkini testified that, after Fadul informed him about the failure of gaining approval from the Iraqi government for TWS, he and Fadul met and "at the end of the conversation it turned out that the [MOC] had nothing to do with [the approval] and there was really no approval needed, that [Fadul could] utilize whatever equipment he want[ed]."

original). In Section 3.1 of the April Operating Agreement, Fadul and Dynacorp, jointly and severally, represented and warranted that they owned or controlled 100% of VitalTel and had "the full power, capacity and authority to enter into this Agreement and to consummate the transactions contemplated hereby," *i.e.* transfer of ownership of VitalTel to Moutiny. *Compare First Union Nat'l Bank,* 154 Md.App. at 141–43, 838 A.2d 404 (We concluded that the best efforts clause was subject to differing interpretations, that the parties had not discussed what the "best efforts" clause meant, and that the contract itself did not provide a definition of terms within the clause.).

In May 2006, just five weeks after signing the April Operating Agreement, Fadul began a period of delay and false assurances in providing Salkini documentation of the alleged transfer of VitalTel to Moutiny. On May 20, 2006, Fadul e-mailed Salkini that the Iraqi attorney, Al–Hadethy, would complete the transaction papers "this week" transferring VitalTel to Moutiny, but that the paperwork needed to be authenticated by the Ministry of Foreign Affairs in Iraq. On May 22, 2006, Fadul e-mailed Salkini that Al–Hadethy would pick up the completed papers "today" from the government entity. On July 19, 2006, after a period of two months' delay from Fadul's May 22, 2006, e-mail informing Salkini that Al–Hadethy would retrieve the documentation from the government "today," Fadul forwarded documents to Salkini purporting to confirm the transfer of ownership of VitalTel to Moutiny. The documents were written in Arabic but displayed the name VitalTel in various places. At trial, Salkini introduced into evidence English translations of the documents as Defense Exhibit 34B. According to Salkini's translated document, titled "Completion of Process," the Iraqi Ministry of Trade purportedly certified that the process of selling one million shares of "Al–Hayawi (VitalTel)" to "Moutiny . . . in accordance with Corporate Law # 21" had been completed.

The circuit court drew a negative inference against Fadul with respect to whether VitalTel was transferred to Moutiny-observing that "Fadul failed to offer into evidence any docu-

ment demonstrating that VitalTel was transferred to Moutiny in accordance with the April Operating Agreement[,]" and finding, in essence, that the transfer did not occur.[28] Simply put, we agree. No documents were introduced into evidence, at trial, verifying that VitalTel was actually transferred to Moutiny as purported by the document Fadul sent to Salkini. Indeed, at trial, Fadul failed to positively identify either defense exhibit 49 or defense exhibit 34A as the documents transferring ownership of VitalTel to Moutiny, stating that defense exhibit 49 contained a signature that did not "resemble" his signature, and that defense exhibit 34A—which he could not recall previously viewing-contained documents which were not the "same papers." In its Memorandum Opinion, the circuit court explicitly found that documents "showing that VitalTel was transferred to Moutiny" were "conspicuously missing from the Court record[.]"

On October 11, 2006, despite having entered into the April Operating Agreement in which he represented that he would convey VitalTel to Moutiny and not engage in any competitive business ventures, Fadul and Al Bahash created Al–Shams, a

---

**28.** At oral argument, appellants contended that the circuit court found in its Memorandum Opinion that the transfer of VitalTel to Moutiny occurred. Needless to say, appellees disagreed. When asked by this Court to identify a location in the record that supported the contention that the circuit court found the transfer occurred, appellants' counsel pointed to the following: (1) In the memorandum opinion, the circuit court noted that, after the April Operating Agreement was executed, Al–Hadethy was asked to effectuate the transfer of VitalTel to Moutiny; and (2) the circuit court wrote that the documents contained in defense exhibit 34A were sent to Salkini by Fadul to establish that 100% of the shares of VitalTel had been successfully transferred to Moutiny.

Although appellants contend that the circuit court found the transfer occurred, appellants rely exclusively on the two statements above, neither of which is a finding by the circuit court that Fadul transferred ownership of VitalTel to Moutiny. The circuit court explicitly found that Fadul failed to produce any evidence demonstrating the transfer was effectuated and that it drew a "negative inference" from that failure. Indeed, the record demonstrates that Fadul disavowed the very documents contained in defense exhibit 34A and in defense exhibit 49, which purported to demonstrate the transfer of VitalTel to Moutiny. We find no merit whatsoever in appellants' argument that the circuit court determined Fadul transferred ownership of VitalTel to Moutiny.

company set up to provide wireless telecommunication services in Iraq. Although the record does not contain a specific date on which Fadul began to negotiate with Al Bahash to create Al–Shams, logic dictates that Fadul's creation of Al–Shams was conceived prior to the October 11, 2006, filing of the "Resolution license to establish a company." Within six months, after representing in the April Operating Agreement that he would convey VitalTel to Moutiny for purposes of establishing a wireless telecommunications network in Iraq, Fadul started another business entity for the same purpose and did not disclose this to Salkini.[29]

---

**29.** The August 7, 2006, letter from the Iraqi government did not constitute a significant change in circumstances that alleviated Fadul's obligations under the April Operating Agreement—namely, Fadul's promise to transfer ownership of VitalTel to Moutiny. In the August 7, 2006, letter, the Minister of the MOC made clear that the invalidity of VitalTel's License was temporary and that, after review of the contracts, the Minister expected to "obtain the approval of the Cabinet of Ministers" to proceed under the License. Salkini testified that, despite the invalidity of the License, Aramtel continued to make payments to Moutiny pursuant to the April Operating Agreement and TWS continued to deliver equipment pursuant to the April Purchase Agreement. The record demonstrates that Fadul continued to assure Salkini that the License was "going to be reinstated, that it[ was] just in suspension status, and that all the provinces that were assigned to th[e L]icense [were] going to be reinstated." In the Moutiny Status Report dated December 13, 2006, Fadul stated that he was "working closely with the MOC to finalize [an] amendment" to the License, and that he was doing "everything in [his] power to restore the [L]icense." Indeed, at oral argument, appellants acknowledged that after receiving the August 7, 2006, communication from the MOC, the parties agreed to continue to try to get the License back, and that Fadul and Salkini continued to perform pursuant to the April Operating Agreement.

In short, the temporary invalidity of the License did not disrupt the parties' respective obligations under the April Operating Agreement—the April Operating Agreement remained in full effect. The record is devoid of any information that the License would not be reissued—*i.e.* that the invalidity of the License in August 2006 was permanent and irrevocable—or that the invalidity of the License released Fadul of his obligation to transfer ownership of VitalTel to Moutiny. Fadul's negotiation of the April Operating Agreement eliminating the requirement that the License be held directly by Moutiny, his delay in producing the purported documentation of the transfer of VitalTel to Moutiny, and his sending of documents on July 20, 2006, to Salkini—which he later testified were "forgeries," all preceded notice of the suspension of the License. The temporary invalidity of the License did not constitute a

In March 2007, with Al–Shams already having been created, Fadul held two meetings—one, on March 8, 2007, and the other a special meeting, on March 14, 2007—with Salkini and others purportedly to discuss the progress of the reinstatement of VitalTel's License. The March 14, 2007, special meeting ended with Fadul's promise to provide a progress report on June 1, 2007, on the procurement of VitalTel's License. In May, 2007, Fadul told Salkini that VitalTel's License would not be reissued. In a letter introduced into evidence at trial as defense exhibit 55, the Director General of the Legal Department for the Ministry of Telecommunication for the Republic of Iraq, wrote that, on May 15, 2007, the VitalTel License was reissued to Al Khat Al Hayawi, "which is considered the same company" as VitalTel "according to the official letters and correspondence with it[.]" It is clear that at the time Fadul told Salkini that the License would not be reissued to VitalTel, he was aware that the License was in the process of being reissued to VitalTel under its Arabic name, Al Khat Al Hayawi.

On June 16, 2007, despite his representation to appellees in the April Operating Agreement—that VitalTel would be conveyed to Moutiny—and despite his subsequent representation to appellees—that VitalTel had been conveyed to Moutiny— Fadul actually conveyed VitalTel under the name Al Khat Al Hayawi to Al Bahash, **not** Moutiny. On October 10, 2007, the Company Registrar of Iraq issued a document titled "Decision to merge limited companies," documenting the merger of both Al Khat Al Hayawi and Al–Shams into Al Nakheel by resolutions dated October 1, 2007, from the general assemblies of each company. In February 2008, Fadul become chief executive officer of Al Nakheel. Fadul never disclosed to appellees the conveyance of VitalTel to Al Bahash.

Using VitalTel's license, Al Nakheel has essentially taken Moutiny's place. Al Nakheel now operates in several of the

---

significant change in circumstances as to the April Operating Agreement nor does it undermine the conclusion as to Fadul's pre-existing fraudulent intent.

Iraqi provinces in which VitalTel had been licensed to operate.[30] Al Nakheel uses the four-digit network code that had been assigned to VitalTel and the radio frequencies that had been assigned to Moutiny. Al Nakheel now employs at least six former Moutiny employees, including Al–Hadethy, Fadul's personal counsel.

**The evidence discussed above establishes that, in the April Operating Agreement, Fadul falsely represented to appellees that he would convey VitalTel to Moutiny when, in fact, Fadul intended to convey VitalTel under its Arabic name, Al Khat Al Hayawi, to Al Bahash.** The evidence clearly and convincingly demonstrates that, in the April Operating Agreement, Fadul falsely represented that he would transfer VitalTel to Moutiny with knowledge of the falsity or reckless indifference to the truth.

### (ii) Purpose of Defrauding

The purpose of the fraudulent misrepresentation was to induce appellees to invest in Moutiny. As a result of the April Operating Agreement and accompanying Note, appellees invested $500,000 in Moutiny and loaned $30,000,000 to Moutiny. VitalTel/Moutiny's Quickbook accounts, introduced into evidence as defense exhibit 99A, demonstrate that on December 18, 2006, January 16, 21, and 28, 2007, Fadul withdrew money for "Cash on Hand" in the amounts of $90,000, $50,000, $50,000, and $100,000, respectively, without authorization from Aramtel. A plaintiff satisfies fraudulent inducement's element of a purpose of defrauding where circumstantial evidence establishes that a defendant had an ulterior motive for making the false representation to the plaintiff. *See First Union Nat'l Bank*, 154 Md.App. at 159, 838 A.2d 404. We are satisfied that the evidence established that Fadul made his false representation for the purpose of taking at least some of Moutiny's funding for himself.

---

**30.** The provinces include Baghdad, Najaf, Karbala, Hilla, Qadasiya, and Samawah.

### (iii) Reliance, and Right to Rely, on False Representation

■■■■ VitalTel was the only asset that Fadul was obligated to contribute to Moutiny. Absent this critical representation, appellees had no reason to enter into the April Operating Agreement or Note. As the circuit court concluded, "Aramtel relied on Fadul's false [ ]representations. . . . Based on Fadul's representations that VitalTel and its license had been [conveyed] to Moutiny, Aramtel continued to loan significant sums to Moutiny[.]" A plaintiff satisfies fraudulent inducement's element of reliance, and the right to rely, on a false representation where the evidence establishes that the plaintiff would have acted differently but for the representation. *Id.* at 134, 838 A.2d 404. In lending money to Moutiny, appellees relied on Fadul's representation—that he would convey VitalTel to Moutiny—and appellees had the right to rely on Fadul's false representation because Fadul's false representation was part of the April Operating Agreement, a written contract that was signed by both parties and stated in no uncertain terms that Fadul was to contribute to Moutiny "100% of all of the ownership interests in Vit[a]lTel." [31]

### (iv) Causation of Actual Damages

■■■■ As a result of the April Operating Agreement and Note, appellees invested $500,000 in Moutiny and loaned $30,000,000 to Aramtel. The circuit court detailed the damages incurred by Aramtel in the Memorandum Opinion as follows:

This Court finds that Aramtel initially invested five hundred thousand dollars ($500,000.00) in Moutiny and then promised to loan five million dollars ($5,000,000.00) to be used for operating expenses. Aramtel then loaned Moutiny twenty-five million dollars ($25,000,000.00) to be used to fund the purchase of telecommunications equipment from

---

**31.** Because we conclude that Fadul's false representation was embodied in the April Operating Agreement, we find unpersuasive appellants' reliance on the "integration clause."

TWS. This Court therefore finds that Aramtel suffered $30,500,000.00 in damages, and [o]rders Fadul to compensate Aramtel for its investment by repaying this amount plus interest.

A plaintiff satisfies fraudulent inducement's element of causation of actual damages where the evidence establishes that the plaintiff lost assets as a result of the false representation. *See First Nat'l Bank,* 154 Md.App. at 134, 838 A.2d 404 (To establish fraudulent inducement, a plaintiff must prove "that he [or she] actually suffered damage directly resulting from such fraudulent misrepresentation." (Citation omitted)). In this case, appellees suffered monetary losses—*i.e.* actual damages-as a result of Fadul's false representation.[32]

As to the damages Aramtel incurred as a result of entering and signing the April Operating Agreement and Note—$500,000 capital contribution, $5,000,000 loan for operating expenses, and $25,000,000 separate loan for the purchase of equipment—we find no merit in appellants' contention that Fadul may not be held personally liable. Aramtel's claim for fraudulent inducement was not a claim for damages or repay-

---

**32.** We find unpersuasive appellants' contentions that "the claim for damages under the Note was released by merger into a confessed judgment that Aramtel already had received with respect to the Note" and that "the [c]ircuit [c]ourt erroneously ordered [ ] Fadul to 'repay' mon[ies] that he never received on a note that he did not personally sign, but were instead loaned by Aramtel to Moutiny and VitalTel, and where Aramtel expressly agreed that, as a condition to get [ ] Fadul to sign the April [Operating] Agreement, [ ] Fadul would not be liable on the up to $30 million loan that Aramtel would make to Moutiny and VitalTel." (Emphasis omitted). Although a party can contract out of liability for repayment of a loan, a party cannot contract out of liability for fraud. *See generally Wolf v. Ford,* 335 Md. 525, 537, 644 A.2d 522 (1994) (The Court of Appeals observed case law pursuant to which an "exculpatory clause in investment contract [is] invalid insofar as it attempts to disclaim liability for fraud[.]" (Citation omitted)). Although appellants assert that, due to merger, the Note cannot serve as a measure of damages, appellants identify no case law supporting the argument and we, therefore, decline to address the matter. *See Assateague Coastkeeper v. Md. Dep't of the Env't,* 200 Md.App. 665, 670 n. 4, 28 A.3d 178 (2011), *cert. denied,* 424 Md. 291, 35 A.3d 488 (2012) ("Appellants failed[ ] to present any argument on [one] issue. Therefore, we will not address it.").

ment under the agreement or the note, but rather a claim alleging fraud **by Fadul.** Section 12.3 of the April Operating Agreement contemplated circumstances in which the Managing Member—Fadul—could be "**liable, responsible or accountable in damages** or otherwise to ... any Interest Holder" for acts or omissions "made criminally, **fraudulently** or in bad faith[.]" (Emphasis added). Aramtel, as a Member of Moutiny and a lender of large sums of money to Moutiny, was, by the very terms of the April Operating Agreement, an "Interest Holder," *i.e.* a "Person who [held] an Interest" in Moutiny. Under the April Operating Agreement, Fadul's fraudulent inducement and accompanying conduct constitute circumstances for which he could be held personally liable for damages.

In addition to the terms of the April Operating Agreement not shielding Fadul from personal liability, the "corporate veil" offers no protection. Proof of fraud by clear, specific acts warrants piercing the corporate veil and imposing liability. *See Ramlall,* 202 Md.App. at 30, 30 A.3d 1003 ("The ... rule in Maryland is that although courts will, in a proper case, disregard the corporate entity and deal with substance rather than form, as though a corporation did not exist, shareholders generally are not held individually liable for debts or obligations of a corporation except where it is necessary to prevent fraud or enforce a paramount equity." (Citation omitted)).

For the reasons above, we are satisfied that, evaluated in its entirety, the evidence established that Fadul fraudulently induced Aramtel to invest $500,000 in, and loan at least $30,000,000 to, Moutiny, and that the circuit court properly awarded damages.

## II.

### Standing to Bring Derivative Claims

### (1) Contentions

Appellants contend that the circuit court erred in holding that Aramtel had standing to bring the derivative claims

against appellants. Appellants argue that, in Section 4.1 of the April Operating Agreement, Aramtel and Dynacorp, the two Moutiny members "agreed that neither Member could act on behalf of Moutiny without the consent of the other Member[,]" and that "Aramtel did not have Dynacorp's consent to bring the [d]erivative [c]ounts on behalf of Moutiny against" appellants. Appellants assert that the circuit court held that "Dynacorp [ ] lacked authority to pursue its causes of action [on Moutiny's behalf] against Aramtel and TWS[,]" but failed to address appellants' "parallel argument that, if Dynacorp was without authority to have Moutiny bring causes of action, Aramtel similarly lacked authority to have Moutiny bring causes of action."

Appellees respond that the circuit court properly held that Aramtel had standing to bring derivative claims on Moutiny's behalf. Appellees point out that, in the separate action that Aramtel filed against appellants, upon motion by appellants, the circuit court concluded "that claims involving *post*-Operating Agreement conduct *must* be pursued by Aramtel as derivative claims, not direct claims." (Emphasis in original). Appellees contend that Section 4.1 of the April Operating Agreement addresses Moutiny's day-to-day management, and does not "prohibit, and should not be interpreted to prohibit, Aramtel from pursing a derivative action to enforce a right of Moutiny as one of its members."

As to appellants' contention that the circuit court applied Section 4.1 inconsistently, appellees maintain that "[a]ppellants completely ignore the fact that Fadul and Dynacorp were not attempting to bring *derivative* claims on behalf of Moutiny, but rather Fadul initiated direct claims *in Moutiny's name* against Aramtel[.]" (Emphasis in original).

In a reply brief, appellants contend that Section 4.1 of the April Operating Agreement prevents a derivative action, and that, had any member of Moutiny "wanted to except a Member's right to bring a shareholder derivative suit in Moutiny's name from Section 4.1's absolute prohibition against any 'act

for or bind[ing]' Moutiny, they could have included such a[n] exception in the April [Operating] Agreement's language."

## (2) Standard of Review

██ An appellate court reviews *de novo* a trial court's legal conclusion as to a contract's interpretation. *See Weichert Co. of Md. v. Faust*, 419 Md. 306, 317, 19 A.3d 393 (2011) ("The interpretation of a written contract is a question of law for the court subject to *de novo* review." (Citation omitted)).

██ An appellate court reviews *de novo* a trial court's legal conclusion as to a party's ability to bring derivative claims. *See Chicago Title Ins. Co. v. Lumbermen's Mut. Cas. Co.*, 120 Md.App. 538, 559, 707 A.2d 913 (1998) (This Court noted that a party's ability to bring derivative claims is "a matter of law.").

## (3) Law

The following principles and authorities are applicable to analysis of the standing issue.

### (a) Judicial Estoppel

In *Mona v. Mona Elec. Group, Inc.*, 176 Md.App. 672, 726, 934 A.2d 450 (2007), this Court explained judicial estoppel. This Court stated:

> Judicial estoppel ... precludes a party from taking a position in a subsequent action inconsistent with a position taken by him or her in a previous action. In order for judicial estoppel to apply, three circumstances must be present:
>
> > (1) one of the parties takes a ... position [33] that is inconsistent with a position it took in previous litigation;

---

**33.** We omit the word "factual" from the phrase "factual position" because judicial estoppel also applies to legal positions. *See Chaney Enters. Ltd. P'ship v. Windsor*, 158 Md.App. 1, 45, 43, 854 A.2d 233 (2004) (This Court held that a party was judicially estopped from making "the assertion of a legal position inconsistent with one previously advanced in a legal proceeding.").

(2) the previous inconsistent position was accepted by a court; and

(3) the party who is maintaining the inconsistent position must have intentionally misled the court in order to gain an unfair advantage.

*Id.* (citations and internal quotation marks omitted).

In *Mona, id.* at 726–27, 934 A.2d 450, this Court held that judicial estoppel did not apply because: (1) the party to be judicially estopped took a previous inconsistent position within the same litigation, not an inconsistent position in a previous litigation, and (2) the trial court neither addressed nor accepted the position of the party to be judicially estopped.

In *Chaney Enters. Ltd. P'ship,* 158 Md.App. at 45, 42–43, 854 A.2d 233, this Court held that judicial estoppel applied because: (1) the judicially estopped party—a company that "loaned" an employee to another company, where the employee was injured—did not contest the injured employee's workers' compensation claim, but later sued for indemnification the company that had been "loaned" the employee, (2) the workers' compensation commission accepted the position that the judicially estopped company was the injured employee's sole employer, and (3) the judicially estopped company "contravened the principles embodied in the statutory scheme" of workers' compensation.

### (b) Contract Interpretation

In *Balt. Cnty. v. AECOM Srvcs. Inc.,* 200 Md.App. 380, 400, 28 A.3d 11 *cert. denied,* 424 Md. 55, 33 A.3d 981 (2011), we discussed the principles guiding contract interpretation, stating: "Appellate courts take 'an objective approach to contract interpretation, according to which, unless a contract's language is ambiguous, we give effect to that language as written without concern for the subjective intent of the parties at the time of formation.' " (Citations omitted). When interpreting a contract to determine its meaning, appellate courts focus "on the four corners of the agreement[,]" *Cochran v. Norkunas,* 398 Md. 1, 17, 919 A.2d 700 (2007), and "ascribe to

the contract's language its customary, ordinary, and accepted meaning." *AECOM Srvcs.*, 200 Md.App. at 401, 28 A.3d 11 (citations and internal quotation marks omitted). Under the objective approach to contract interpretation, an appellate court does not consider the subjective interpretations and intent of the parties, but rather "look[s] at what a reasonably prudent person in the same position would have understood as to the meaning of the agreement." *Cochran*, 398 Md. at 17, 919 A.2d 700 (citation omitted). Accordingly, "the true test of what is meant is not what the parties to the contract intended it to mean, but what a reasonable person in the position of the parties would have thought it meant." *Id.* (quoting *General Motors Acceptance Corp. v. Daniels*, 303 Md. 254, 261, 492 A.2d 1306 (1985)). The Court of Appeals has also noted:

> "A recognized rule of construction in ascertaining the true meaning of a contract is that the contract must be construed in its entirety and, if reasonably possible, effect must be given to each clause so that a court will not find an interpretation which casts out or disregards a meaningful part of the language of the writing unless no other course can be sensibly and reasonably followed."

*Id.* (quoting *Sagner v. Glenangus Farms*, 234 Md. 156, 167, 198 A.2d 277 (1964)).

### (c) Direct vs. Derivative Claims

In *Boland v. Boland*, 423 Md. 296, 316, 31 A.3d 529 (2011), the Court of Appeals explained the distinction between a direct claim and a derivative claim, stating that Maryland courts look to "the nature of the right claimed to be violated, and the remedy sought" as guidance. Where a claim is based on a breach of duty owed directly to the shareholder and the injury is suffered only by the shareholder and not the corporate entity as a whole, then the claim is a direct claim. *Id.* In contrast, a derivative claim "involves a *corporate right*" brought on behalf of the corporate entity, rather than the shareholder. *Id.* (emphasis in original) (citation omitted). Accordingly, in a derivative action, "any recovery belongs to

the [corporate entity], not the plaintiff shareholder." *Shenker v. Laureate Educ., Inc.,* 411 Md. 317, 344, 983 A.2d 408 (2009).

### (4) Analysis

We begin our analysis by noting that, on appeal, the issue before this Court is whether Aramtel had standing under the April Operating Agreement to bring derivative claims on Moutiny's behalf against Fadul, Dynacorp, and TeckTel. The parties do not raise, and we do not address, any issue as to legal standing to bring suit.[34]

### (a) Judicial Estoppel

Although the parties do not raise the issue of judicial estoppel as to standing to bring derivative claims, upon *de novo* review, we conclude that appellants are judicially estopped from contending that appellees are prohibited from bringing derivative claims on Moutiny's behalf. In Aramtel's original action against appellants—*Aramtel, Ltd. v. Fadul, et. al,* Case No. 13–C–07–69958 in the circuit court-appellants contended that Aramtel was required to bring derivative claims, not direct claims, on Moutiny's behalf. The circuit court agreed and entered summary judgment in appellants' favor.[35] Via counterclaims in the instant case—*Dynacorp,*

---

**34.** In the first amended counterclaim, appellees pled that demand on the board would be futile. *See Shenker,* 411 Md. at 344, 983 A.2d 408 ("In order to sue derivatively on behalf of the corporation, ... the derivative plaintiff either must make a demand on the corporation's board of directors to pursue the claim against the offending parties or demonstrate to the court that such demand would be futile due to the conflicting interests of the members of the board." (Citations omitted)). On appeal, there is no dispute as to this issue.

**35.** Before orally ruling from the bench, the following exchange occurred between appellants' counsel and the circuit court:

THE COURT: So you would concede—you would concede[ ] that if every wrong has a remedy, and if there, in theory, was a wrong in this case, that the remedy should be through a derivative claim; is that correct?

[APPELLANTS' COUNSEL]: Well, the right exists through Moutiny; every claim that they're making is a claim that is Moutiny's. It is not

*Ltd., et al. v. Aramtel, Ltd., et al.,* Case No. 13–C–08–072145 CN in the circuit court—Aramtel brought derivative claims on Moutiny's behalf. In the instant case, contrary to their earlier assertion, appellants contend that Aramtel is not permitted to bring derivative claims on Moutiny's behalf. Judicial estoppel prevents a party from taking a position in a litigation where: (1) the party took an inconsistent position—either legal or factual—in an earlier litigation, (2) a court accepted the earlier inconsistent position, and (3) the party intentionally misled the court to gain an unfair advantage. *Mona,* 176 Md.App. at 726, 934 A.2d 450; *Chaney Enters. Ltd. P'ship.,* 158 Md.App. at 45, 43, 854 A.2d 233 (This Court held that judicial estoppel applies to legal positions.). Based on all of the above, we are satisfied that appellants are judicially estopped from contending that appellees cannot bring derivative claims on Moutiny's behalf because: (1) appellants took an inconsistent position in Aramtel's original action against appellants, (2) the circuit court accepted appellants' earlier inconsistent position by granting summary judgment against Aramtel, and (3) appellants intentionally misled the circuit court so that summary judgment would be granted, while appellants intended all along to contend in the instant case that Aramtel could not bring derivative claims on Moutiny's behalf.

### (b) The Contract Language

 Although we determine that appellants are judicially estopped from contending that appellees cannot pursue derivative claims, we, nonetheless, conclude that the plain language of the April Operating Agreement does not preclude appellees' derivative claims. Section 4.1 states, in its entirety:

Section 4.1. *No Management Power.* No Member solely by virtue of being a Member may take part in the management, conduct or control of the business of the Company or have any right or authority to act for or bind the Company

---

an independent, separate, and distinct claim.... And they have to bring, or attempt to bring that, through a derivative action[.]

as a Member, except as otherwise provided in this Agreement.

Upon review of the plain language of Section 4. 1, we conclude that the plain meaning of the section is clear—Members, clearly defined by the April Operating Agreement to be Aramtel and Dynacorp, may not take part in conducting, managing, or controlling the operations of Moutiny, as a Member, unless otherwise authorized to do so in the April Operating Agreement. Presumably appellants rely on the language stating no member shall have any right "to act for or bind" the company except otherwise provided in the agreement to reach the conclusion that a member may not bring a derivative action unless the agreement so provides. This reliance is misplaced. Article IV titled "Management" contains six sections which set forth the management responsibilities and structure of the company. The six sections of Article IV are titled: 4.1—No Management Power; 4.2—Management by Managing Member; 4.3—Restrictions on Authority; 4.4—Officers; 4.5—Board of Directors; and 4.6—Non–Compete Restrictions. None of the sections address in any manner a member's ability to bring legal action.

Section 4.2 of the April Operating Agreement states in clear and simple language that the Managing Member, defined in Article II to be Fadul, was to manage the day-to-day operations of Moutiny and VitalTel and "do any and all other things . . . deem[ed] necessary or desirable in connection with the conduct of the business and affairs of [Moutiny] and/or Vit[a]l-Tel."

Section 4.3 restricts the authority granted to the Managing Member, and provides in subsection (i) that the Managing Member shall not have authority, prior to the satisfaction of the Note, to enter into a contract or obligation on behalf of Moutiny or VitalTel in excess of $50,000 "except with the consent of the Majority of Members[.]" Section 4.4 provides that the Managing Member shall serve as the chief executive officer of Moutiny and VitalTel for at least two years, and that officers who are not Members may be removed at any time by the Managing Member. Section 4.5 provides that, by a vote of

the Majority of the Members, the Members may establish a board of directors as well as the responsibilities and powers of the board. Section 4.6 provides that Fadul, Dynacorp, and TeckTel may not engage in competitive wireless telecommunication business activities in Iraq and that they must present any wireless telecommunication business activities to Moutiny and VitalTel. By a plain reading, Section 4.1 of Article IV of the April Operating Agreement, and the other five sections of Article IV—4.2, 4.3, 4.4, 4.5, and 4.6—pertain to management and operation of the company, and provide that a Managing Member would be responsible for day-to-day management of the company and its business affairs, and that members must not engage in undisclosed competitive business activities. In neither Section 4.1 nor any other section within the agreement did the parties agree that consent was a prerequisite for filing a derivative action on behalf of Moutiny.

"Under the objective approach to contract interpretation, the inquiry as to the meaning of the language of the contract is restricted to the four corners of the agreement, and as such, the customary, ordinary, and accepted meaning of the language of the contract is assigned to it." *AECOM Srvcs.*, 200 Md.App. at 403, 28 A.3d 11 (citation omitted). Here, the plain meaning of the April Operating Agreement is clear—despite appellants' contention to the contrary—when viewed from the perspective of a reasonable person in the parties' position.[36]

Although we conclude that the meaning of Section 4.1 of the April Operating Agreement is plain, we shall, nevertheless, briefly address the parties' intent. It is evident that it was

---

**36.** In a reply brief, appellants contend that, had any Member of Moutiny "wanted to except a Member's right to bring a shareholder derivative suit in Moutiny's name from Section 4.1's absolute prohibition against any 'act for or bind[ing]' Moutiny, they could have included such a[n] exception in the April [Operating] Agreement's language." We observe that appellants' rationale is equally applicable to the converse proposition-had the parties wished to clearly and unambiguously require that the consent of the majority of the Members be present in order for one Member to proceed with a derivative suit on behalf of Moutiny, the parties could have included such a provision in the agreement. The parties failed to do so.

not the intent of the parties to prohibit one another from bringing a derivative action on behalf of the joint venture, Moutiny. There is no information in the record that suggests the parties intended to lend to Section 4.1 the meaning that appellants attach to the section. To conclude otherwise would provide both Aramtel and Dynacorp with no recourse for circumstances such as those alleged in the instant case—*i.e.* the company failing, in part or in whole, due to the fraudulent conduct of its Managing Member.[37]

## III.

### Personal Jurisdiction

#### (1) Contentions

Appellants contend that the circuit court lacked specific personal jurisdiction over Fadul, Dynacorp, and TeckTel as to the derivative claims because "the causes of action brought on Moutiny's behalf ... neither arise out of, nor are directly related to, the conduct of [ ] Fadul, Dynacorp or TeckTel within Maryland." Appellants argue that the circuit court lacked general personal jurisdiction over Fadul, Dynacorp, or TeckTel because "there is no evidence that they engaged in continuous and systematic activities in Maryland[,]" including doing or soliciting business, performing work or services, maintaining an office, advertising, or making trips to Maryland related to Moutiny's causes of action. Appellants maintain that correspondence between Fadul, Salkini, and TWS

---

**37.** In light of appellants' concession at oral argument, that in the amended complaint it brought direct claims by Moutiny, we need not address appellants' contention that, after having granted summary judgment as to Fadul's and Dynacorp's claims, the circuit court ruled inconsistently in finding that Aramtel may bring derivative actions on Moutiny's behalf. At oral argument, appellants agreed that their claims were direct claims brought in Moutiny's name rather than derivative claims, but argued that, based on the language of the April Operating Agreement, neither party could bring any claim—direct or derivative— without the permission of the other party. For the reasons discussed *supra,* we conclude that the language of the April Operating Agreement is not so limited and does not support appellants' argument.

"does not demonstrate a persistent course of conduct in Maryland."

Appellants contend that Section 14.5 of the April Operating Agreement, the consent provision, "relates solely to disputes between the 'parties' to the April [Operating] Agreement, . . . and relates only to claims arising under the Agreement[.]" Appellants argue that Moutiny, as a non-party, had no contractual basis to assert that the circuit court had personal jurisdiction over Fadul, Dynacorp, or TeckTel. Appellants maintain that the derivative claims did not arise under the April Operating Agreement because neither Fadul, Dynacorp, nor TeckTel owed an obligation to Moutiny under the agreement because Moutiny was not a party to the agreement.

Appellants contend that the circuit court erred in finding that Fadul, Dynacorp, and TeckTel waived the defense of lack of personal jurisdiction as to the derivative claims. According to appellants, the defense of lack of personal jurisdiction was raised in TeckTel's motion to strike and in appellants' motion to dismiss. Appellants argue that the circuit court erroneously concluded that, because Fadul and Dynacorp initiated the lawsuit by filing the complaint in the circuit court, they submitted to the jurisdiction of the circuit court. Appellants assert that, because Moutiny was not a defendant in the second amended complaint, the second amended complaint "cannot be used to hold them to the personal jurisdiction of the [c]ircuit [c]ourt with respect to Moutiny's counterclaims."

Appellees respond that the circuit court properly exercised personal jurisdiction over Fadul, Dynacorp, and TeckTel as to the derivative claims. Initially, appellees contend that Fadul and Dynacorp waived the defense of lack of personal jurisdiction by not raising the defense pursuant to Maryland Rule 2–322 in a motion to dismiss filed before an answer. Accordingly, appellees argue that the "jurisdiction issue is not reviewable by this Court as to Fadul and Dynacorp."

Alternatively, appellees contend that the circuit court correctly found that Fadul, Dynacorp, and TeckTel contractually consented to the jurisdiction of the circuit court pursuant to

Section 14.5 of the April Operating Agreement. Appellees assert that Section 14.5 provides that any claim arising under the agreement shall be tried in Maryland, and that each "derivative claim is undoubtedly related to, and thus arises under, the [April] Operating Agreement." Appellees argue that, although Moutiny is not a "signatory to the [April] Operating Agreement[,]" Moutiny is bound and governed by the terms of the agreement, and "thus required to bring suit in Maryland against other parties bound by [the] terms [of the agreement]." Appellees contend that "the trial record is replete with evidence that [a]ppellants 'transacted business' in Maryland" such that the exercise of specific jurisdiction was proper.

### (2) Standard of Review

■ An appellate court reviews *de novo* a trial court's legal conclusion as to whether or not the trial court may exercise personal jurisdiction over a defendant. *Himes Assocs., Ltd. v. Anderson*, 178 Md.App. 504, 526, 943 A.2d 30, *cert. denied*, 405 Md. 291, 950 A.2d 829 (2008) ("Our standard of review is *de novo:* we decide whether the trial court was legally correct to exercise personal jurisdiction over" the defendant. (Citation and internal quotation marks omitted)).

### (3) Law

### (a) Consent

In *Dashiell v. Meeks*, 396 Md. 149, 167, 913 A.2d 10 (2006), the Court of Appeals stated that, absent fraud, duress, or mutual mistake, "a party who signs a contract is presumed to have read and understood its terms and … the party will be bound by them when that document is executed." (Citations omitted). This includes forum-selection clauses.[38] "If [the parties] did not [read the agreement] before they signed the agreement, they have no persons to blame but themselves.… It would lead to startling results if a [party], who executes [a

---

**38.** "Forum-selection clauses" are also known as "venue-selection clauses," "choice of venue clauses," or "choice of forum clauses."

contract] can subsequently impeach it on the ground of [the party's] own carelessness though at the very time of [the contract's] execution [the party] might, had [it] seen fit, had advised [it]self fully as to the nature and legal effect of the act [that the party] was doing." *Id.* (second alteration in original) (citations and internal quotation marks omitted).

### (b) Personal Jurisdiction Generally

In *Beyond Sys., Inc.,* 388 Md. at 14, 878 A.2d 567, the Court of Appeals stated that "[w]hether [or not] a [trial] court may exert personal jurisdiction over a foreign defendant entails dual consideration. First, [an appellate court] consider[s] whether the exercise of jurisdiction is authorized under Maryland's long arm statute[.]" (Citations omitted). Md.Code Ann., Cts. & Jud. Proc. Art. ("C.J.P.") § 6–103, Maryland's long arm statute, provides, in pertinent part, as follows:

(b) In general.—A court may exercise personal jurisdiction over a person, who directly or by an agent:

(1) Transacts any business or performs any character of work or service in the State; [or]

. . .

(4) Causes tortious injury in the State or outside of the State by an act or omission outside the State if he regularly does or solicits business, engages in any other persistent course of conduct in the State or derives substantial revenue from goods, food, services, or manufactured products used or consumed in the State[.]

The second consideration "is to determine whether [or not] the exercise of jurisdiction comports with due process requirements of the Fourteenth Amendment." *Beyond Sys., Inc.,* 388 Md. at 15, 878 A.2d 567 (citations omitted).

The statutory consideration and the constitutional consideration occur simultaneously, as the "reach of the long arm statute is coextensive with the limits of personal jurisdiction delineated under the due process clause of the Federal Constitution[.]" *Id.* at 22, 878 A.2d 567 (citations omitted). Accordingly,

[a trial] court's exercise of personal jurisdiction over a nonresident defendant satisfies due process requirements if the defendant has "minimum contacts" with the forum, so that to require the defendant to defend its interests in the forum state "does not offend traditional notions of fair play and substantial justice."

*Id.* (Quoting *Int'l Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945)). Stated otherwise,

"[t]o comply with the Due Process Clause of the Fourteenth Amendment, the exercise of personal jurisdiction over an out-of-state defendant requires that the defendant have established minimum contacts with the forum state and that to hale him or her into court in the forum state would comport with traditional notions of fair play and substantial justice."

*CSR, Ltd. v. Taylor,* 411 Md. 457, 476, 983 A.2d 492 (2009) (citations omitted). When reviewing whether or not an exercise of personal jurisdiction under the "minimum contacts" standard is appropriate, an appellate court should not mechanically apply the standard, but rather should weigh the facts of each case. *Id.* (citation omitted). Indeed, the " 'the quality and quantity of contacts required to support the exercise of personal jurisdiction will depend upon the nature of the action brought and the nexus of the contacts to the subject matter of the action[.]' " *Id.* at 477, 983 A.2d 492 (quoting *Camelback Ski Corp. v. Behning,* 312 Md. 330, 338, 539 A.2d 1107 (1988)).

 Cases are divided into two categories depending upon a defendant's contacts with the State: specific personal jurisdiction or general personal jurisdiction. *Id.* at 477, 983 A.2d 492; *Beyond Sys., Inc.,* 388 Md. at 22, 878 A.2d 567. Specific personal jurisdiction cases arise "where the cause of action arises from, or is directly related to, the defendant's contacts with the forum state[,]" *CSR,* 411 Md. at 477, 983 A.2d 492, *i.e.* "the defendant's contacts with the forum state form the basis for the suit[.]" *Beyond Sys., Inc.,* 388 Md. at 26, 878 A.2d 567. In *Beyond Sys., Inc., id.,* the Court of

Appeals set forth a three-pronged test for considering wheth-er or not specific personal jurisdiction exists:

[A court] consider[s] (1) the extent to which the defendant has purposefully availed itself of the privilege of conducting activities in the State; (2) whether the plaintiffs' claims arise out of those activities directed at the State; and (3) whether the exercise of personal jurisdiction would be con-stitutionally reasonable.

(Citations omitted). In *Himes*, 178 Md.App. at 528–29, 943 A.2d 30, with Judge Deborah S. Eyler speaking for the Court, we discussed specific personal jurisdiction in the context of cases involving contractual disputes, stating:

In the past, when a contractual dispute was involved, in deciding the issue of specific [personal] jurisdiction, we have combined our consideration of the first two factors (whether the defendant "purposefully availed" itself of the state's benefits in conducting business and whether jurisdiction "arose" out of the cause of action), and have reasoned that the exercise of specific [personal] jurisdiction is proper when "the suit is based on a contract that has a substantial connection with the forum State." The mere residency of a party to the contract is not, by itself, sufficient for that State to assert jurisdiction. Nor are "telephone calls and correspondence with the plaintiff in the forum state" alone sufficient to establish a substantial connection.

When, however, the defendant has maintained a set of "continuing obligations" between [it]self and a resident of the forum state, [it] has "availed [it]self of the privilege of conducting business there, and because [its] activities are shielded by 'the benefits and protections' of the forum's laws it is presumptively not unreasonable to require [the defen-dant] to submit to the burdens of litigation in that forum as well.' "

(Citations omitted). In *Bahn v. Chicago Motor Club Ins. Co.*, 98 Md.App. 559, 568, 634 A.2d 63 (1993), we noted that, in specific personal jurisdiction cases, transacting business within the State within the meaning of C.J.P. § 6–103(b)(1) can occur

even if the defendant has never been "physically present" in the State. (Citation omitted).

■ General personal jurisdiction cases, in contrast, "arise from the defendant's general, more persistent contacts with the State" rather than from the cause of action arising out of the defendant's contacts in the State. *Beyond Sys., Inc.,* 388 Md. at 22, 878 A.2d 567; *CSR,* 411 Md. at 477, 983 A.2d 492. In *CSR,* 411 Md. at 477, 983 A.2d 492, the Court of Appeals stated: "To justify the exercise of general jurisdiction, the defendant's contacts with the forum state must be continuous and systematic." (Citations omitted). As with specific personal jurisdiction cases, in general personal jurisdiction cases, an appellate court must consider "whether the defendant 'purposefully availed itself of the privilege of conducting activities in the State,' and 'whether the exercise of personal jurisdiction would be constitutionally reasonable.'" *Id.* at 478, 983 A.2d 492 (quoting *Beyond Sys., Inc.,* 388 Md. at 26, 878 A.2d 567). In *Camelback,* 312 Md. at 339, 539 A.2d 1107, the Court of Appeals cautioned, however, against strict distinction between specific personal jurisdiction and general personal jurisdiction cases, observing:

> The concept of specific and general [personal] jurisdiction is a useful tool in the sometimes difficult task of detecting how much contact is enough, and most cases will fit nicely into one category or the other. If, however, the facts of a given case do not naturally place it at either end of the spectrum, there is no need to jettison the concept, or to force-fit the case. In that instance, the proper approach is to identify the approximate position of the case on the continuum that exists between the two extremes, and apply the corresponding standard, recognizing that the quantum of required contacts increases as the nexus between the contacts and the cause of action decreases.

■ The Court of Appeals has held that a key part of a court's analysis in either a specific personal jurisdiction or a general personal jurisdiction case is determining whether or not the defendant has purposefully availed itself of the privi-

lege of conducting activities within the forum State, "thus invoking the benefits and protections of its laws." *CSR,* 411 Md. at 479, 983 A.2d 492. As the Court of Appeals observed, "the absence of any purposeful availment by the defendant stands as an obstacle to whether the defendant's contacts with the forum state amount to the sufficient minimum contacts necessary to confer jurisdiction[.]" *Id.* In *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 475–76, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985), the Supreme Court described why purposeful availment is important to a personal jurisdiction analysis, stating:

> T[he] "purposeful availment" requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of "random," "fortuitous," or "attenuated" contacts, or of the "unilateral activity of another party of a third person[.]" Jurisdiction is proper, however, where the contacts proximately result from actions by the defendant [it]self that create a "substantial connection" with the forum State. Thus where the defendant "deliberately" has engaged in significant activities within a State, or has created "continuing obligations" between [it]self and residents of the forum, [it] manifestly has availed [it]self of the privilege of conducting business there, and because [its] activities are shielded by "the benefits and protections" of the forum's laws it is presumptively not unreasonable to require [it] to submit to the burdens of litigation in that forum as well.

(Citations, emphasis, and footnotes omitted). A factor related to purposeful availment is "foreseeability" or "notice," *i.e.* that the defendant, in purposefully availing itself of the privilege of conducting activities within the forum State, could reasonably expect or has notice that it could be subjected to suit in the forum State as a result of its conduct and connection with the forum State. *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980); *CSR,* 411 Md. at 480, 983 A.2d 492.

 Another key component of the exercise of specific or general personal jurisdiction is whether the exercise of personal jurisdiction would be constitutionally reasonable.

*Himes,* 178 Md.App. at 531–32, 943 A.2d 30. In *Himes, id.* at 532, 943 A.2d 30, we stated that, in order to determine whether the exercise of personal jurisdiction would be constitutionally reasonable and not "offend traditional notions of fair play and substantial justice," we consider the following factors:

> "the burden on the defendant; the interests of the forum State; the plaintiff's interest in obtaining relief; the interstate judicial system's interest in obtaining the most efficient resolution of controversy; and the shared interest of the several states in furthering fundamental substantive social policies."

(quoting *Camelback,* 312 Md. at 342, 539 A.2d 1107 (citing *Asahi Metal Industry Co., Ltd. v. Superior Court of California,* 480 U.S. 102, 107, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987))).

### (4) Analysis

### (a) Consent

We are satisfied that, in Section 14.5 of the April Operating Agreement—the "forum-selection clause"—appellants consented to personal jurisdiction by Maryland courts.[39] Absent fraud, duress, or mutual mistake, "a party who signs a contract is presumed to have read and understood its terms and [ ] the party will be bound by them when that document is executed." *Dashiell,* 396 Md. at 167, 913 A.2d 10 (citations omitted). "If [the parties] did not [read the agreement] before they signed the agreement, they have no persons to blame but themselves.... It would lead to startling results if a [party], who executes [a contract] can subsequently impeach it on the ground of [the party's] own carelessness though at the very time of [the contract's] execution [the party] might, had [it] seen fit, had advised [it]self fully as to the nature and legal effect of the act [that the party] was doing." *Id.* (second alteration in original) (citations and internal quotation marks omitted). Given the instant case's circumstances—that Fadul,

---

**39.** TeckTel is not a party to this appeal, and we thus do not reach any issue as to personal jurisdiction over TeckTel.

who signed the April Operating Agreement on Dynacorp's behalf: (1) was a competent, educated, adult business professional who was represented by counsel at all times, and (2) signed a written contract after months of negotiations—we conclude that appellants, through the "forum-selection clause," consented to personal jurisdiction by Maryland courts.

Ironically, in the verified amended complaint, as to the circuit court's jurisdiction over Aramtel, appellants alleged the following:

[ ] This Court has jurisdiction over this action pursuant to Section 6–103(b)(1) and Section 6–103(b)(2) of the Courts & Judicial Proceedings Article of the Maryland Code. **Additionally, Defendant Aramtel contractually consented to the jurisdiction of this Court.**

(Emphasis added). If, by signing the April Operating Agreement, Aramtel contractually consented to personal jurisdiction over it by the circuit court, then—at a minimum—Fadul and Dynacorp also contractually consented to personal jurisdiction by the circuit court. To conclude otherwise would strain the bounds of reasoning.

We are unpersuaded by appellants' contention that Moutiny, a "non-party" to the April Operating Agreement, had no contractual basis to assert that the circuit court had personal jurisdiction over Fadul or Dynacorp. Although Moutiny was not a signatory to the April Operating Agreement, Moutiny was created and governed by the April Operating Agreement, and it, too, was bound to bring suit in Maryland pursuant to Section 14.5. Indeed, as explained above, appellants—Fadul, Dynacorp, **and Moutiny**—brought suit in Maryland against appellees, asserting a contractual basis for personal jurisdiction over Aramtel, as evidenced by the verified amended complaint. Thus, what appellants argue before this Court— that Moutiny has no contractual basis upon which to assert the circuit court's personal jurisdiction—is directly contradictory to the position that they took before the circuit court.

██ Appellants' contention that the derivative claims brought by Aramtel on Moutiny's behalf did not "arise under"

the April Operating Agreement and, thus, could not provide a basis for the exercise of personal jurisdiction over Fadul and Dynacorp, is without merit. In Section 12.3 of the April Operating Agreement, the parties agreed that Fadul, as Managing Member, would not be liable **to Moutiny** or any other "Interest Holder" **unless** his actions or omissions were "made criminally, fraudulently or in bad faith, or unless such action or omission constituted gross negligence or an intentional breach of this Agreement." By its plain language, the April Operating Agreement: (1) set forth circumstances under which Moutiny could seek damages from Fadul pursuant to the agreement; and (2) established a duty owed by Fadul to Moutiny and other Interest Holders to refrain from fraudulent and other acts and omissions described in Section 12.3— exactly the types of acts alleged in this case.

### (b) Specific Personal Jurisdiction

Although we conclude, *supra*, that appellants consented under the April Operating Agreement to submit to the personal jurisdiction of the circuit court, we shall nonetheless address whether or not the circuit court erred in exercising personal jurisdiction over Fadul and Dynacorp [40] as to the derivative claims brought on behalf of Moutiny. Upon examination of the record, we conclude that Fadul and Dynacorp transacted business in the State within the meaning of C.J.P. § 6–103(b)(1) and that the circuit court did not err in its exercise of personal jurisdiction over them. We shall examine each of the three factors set forth by the Court of Appeals in *Beyond Sys., Inc.*, 388 Md. at 26, 878 A.2d 567.

### (i) Purposeful Availment

As to the first prong of the specific personal jurisdiction analysis set forth by the Court of Appeals in *Beyond Sys., Inc.*, the record in the instant case reflects that Fadul—a

---

**40.** As previously mentioned, TeckTel is not a party to the appeal before this Court, and we shall therefore not address whether the exercise of personal jurisdiction over TeckTel was authorized by Maryland's long arm statute and in compliance with the Federal Constitution.

Virginia resident, representing himself, Dynacorp, and Vital-Tel—entered into a contract, the April Operating Agreement, in Maryland, with Salkini—a Maryland resident, who represented Aramtel and TWS. Prior to signing the April Operating Agreement, Fadul engaged in extensive negotiations by sending e-mails to Salkini in Maryland over the course of several months, and signing the earlier agreement—the March Operating Agreement—in Maryland. After signing the April Operating Agreement, Fadul participated in meetings of Moutiny in Maryland and continued to correspond frequently with Salkini in Maryland and to provide updates concerning Moutiny. Salkini, the other party to the agreement, performed duties under the April Operating Agreement on behalf of himself, Aramtel, and TWS in Maryland, including participating in and attending meetings of Moutiny's members in Maryland. When the relationship between the parties soured, **Fadul and Dynacorp sued appellees in a circuit court in Maryland.** Accordingly, Fadul and Dynacorp purposefully availed themselves of a contractual business relationship with a Maryland resident and a corporate entity with Maryland headquarters such that they could have reasonably expected that their conduct could subject them to suit within Maryland. *See World–Wide Volkswagen,* 444 U.S. at 297, 100 S.Ct. 559 ("When a [defendant] 'purposefully avails itself of the privilege of conducting activities within the forum State,' it has clear notice that it is subject to suit there[.]" (Citation omitted)). Fadul and Dynacorp, by bringing suit against appellees in Maryland, clearly and purposefully "invok[ed] the benefits and protections" of Maryland law. *CSR,* 411 Md. at 479, 983 A.2d 492. To conclude that Fadul and Dynacorp could sue, and assert claims on Moutiny's behalf, in Maryland, but not be subject to suit in return, would be contrary to the rule of logic.

### (ii) Claims Arising Out of Activities Directed at Maryland

■ As to the second prong set forth in *Beyond Sys., Inc.,* the issue is whether Fadul's and Dynacorp's actions—in breaching duties owed to Moutiny and committing other wrongs against Moutiny under the April Operating Agree-

ment, as alleged in the first amended counterclaim—were substantively connected to Maryland. Moutiny, the joint venture, was created by the April Operating Agreement—signed in Maryland—and the parties' conduct and any dispute concerning Moutiny were to be governed by Maryland law pursuant to Section 14.5 of the April Operating Agreement. Meetings of Moutiny occurred and were scheduled to occur in Maryland. Status updates concerning Moutiny and Fadul's actions regarding Moutiny—or lack thereof—as well as requests for additional funds for Moutiny, were e-mailed to Salkini in Maryland and provided in person by Fadul at Moutiny's meeting in Maryland. In total, Fadul and Dynacorp purposefully availed themselves of the privilege of doing business in Maryland, and the causes of action brought on Moutiny's behalf against Fadul and Dynacorp arose out of the April Operating Agreement, which was negotiated, signed, and performed, at least in part, in Maryland. We observe that it is disingenuous on appellants' part to bring claims in a circuit court in Maryland directly in Moutiny's name in the second amended complaint—the substance of which is similar to the substance of the claims appellees asserted on Moutiny's behalf in the first amended counterclaim—and yet argue before this Court that such claims are not related to or arising from the parties' conduct within Maryland.

### (iii) Whether the Exercise of Personal Jurisdiction Would be Constitutionally Reasonable

Turning to the third prong of a specific personal jurisdiction analysis, we are satisfied that the circuit court's exercise of personal jurisdiction over Fadul and Dynacorp was constitutionally reasonable. A review of the record demonstrates that the burden on Fadul and Dynacorp to defend against the counterclaims was minimal, as they had already initiated suit in Maryland against appellees, and the claims mostly involved the same parties and the same factual background. Maryland, appellants' chosen forum State, clearly has an interest in efficiently resolving the controversy and claims between the parties related to the April Operating Agreement in one lawsuit. Maryland also "has a significant

interest in protecting the rights of its residents[,]" *Himes,* 178 Md.App. at 532, 943 A.2d 30, and in resolving disputes related to a contract signed in Maryland, performed—at least in part—in Maryland, and by its very terms, governed by Maryland law (as set forth in Section 14.5 of the April Operating Agreement). Based on the circumstances before us, we conclude that the exercise of personal jurisdiction was constitutionally reasonable, and that the circuit court had specific personal jurisdiction over Fadul and Dynacorp.[41]

Because we conclude that the circuit court properly exercised specific personal jurisdiction over Fadul and Dynacorp, we need not address the issue of general personal jurisdiction. *Himes,* 178 Md.App. at 532 n. 3, 943 A.2d 30.[42]

## IV.

### Merits of the Derivative Claims

#### (1) Contentions

Appellants contend that the circuit court erred in granting judgment in favor of appellees as to Counts II–VIII, the

---

41. Appellants' argument that "mere execution of a contract in Maryland ... is inadequate" to establish specific personal jurisdiction is without merit. As the record reveals, Fadul and Dynacorp did much more than simply execute a contract in Maryland—they corresponded with Salkini, a Maryland resident, in Maryland; they attended meetings related to the contract in Maryland; and, they brought suit pursuant to the contract in Maryland. In *Jason Pharm., Inc. v. Jianas Bros. Packaging Co.,* 94 Md.App. 425, 433–34, 617 A.2d 1125 (1993), we held that a one-transaction contract with a Maryland entity, coupled with "sufficient evidence of 'purposeful activity' " may constitute "transacting business" within the meaning of C.J.P. § 6–103(b)(1). *See also Young Again Prods., Inc. v. Acord,* 307 F.Supp.2d 713, 714–15, 717 (2004) (The United States District Court for the District of Maryland denied the defendants' motion to dismiss for lack of personal jurisdiction, finding that the defendants had transacted business within the meaning of C.J.P. § 6–103(b)(1) when they contracted to buy and resell various products for the plaintiff, a Maryland corporation, and **negotiated and entered into an agreement in Maryland.** (Emphasis added)).

42. Because we find that appellants consented to jurisdiction and that the circuit court properly exercised specific personal jurisdiction over appellants, we need not address the parties' contentions concerning waiver of the defense of lack of personal jurisdiction.

derivative claims, because the circuit court "did not award damages for any of the derivative claims brought by Aramtel." As to Counts III, IV, and V, the derivative claims for fraud, constructive fraud, and negligent misrepresentation, appellants argue that the circuit court erred in granting judgment in favor of Aramtel because "the [c]ircuit [c]ourt separately found that Moutiny had not suffered compensable damages, a required element of each of the causes of action for fraud."

As to Count VI, the derivative claim for breach of fiduciary duty, in addition to contending a lack of proven damages, appellants maintain that Maryland law "does not recognize a separate tort action for breach of fiduciary duty[,]" and therefore, the circuit court erred in finding that Aramtel had proven the elements of the claim. As to Count VII, the derivative claim for conversion, appellants contend that the circuit court erred in granting judgment in favor of Aramtel as to the claim "because the value of the allegedly converted asset was too speculative to award damages[.]" As to Count VIII, the derivative claim for usurpation of corporate opportunity and corporate waste, appellants argue that the circuit court erred in granting judgment in favor of Aramtel because Aramtel failed to prove compensable harm resulting from the breach.

Appellees respond that the circuit court "was not required to enumerate count by count the damages it awarded[,]" but rather "was simply required to identify damages incurred by Moutiny[.]" [43] As to Counts III, IV, and V, appellees contend that the circuit court properly found that Moutiny incurred damages in the form of out-of-pocket expenses. As to Count VI, appellees argue that Maryland recognizes the claim of breach of fiduciary duty and that Fadul, who owed a duty to Moutiny by virtue of being the Managing Member, breached his duty. As to Count VII, appellees assert that the record supports the circuit court's award for damages for conversion, because Fadul placed a value of $75,000,000 on the License.

---

43. Appellees do not present a specific argument as to damages for Count II.

As to Count VIII, appellees maintain that the circuit court found that Moutiny was harmed by Fadul's failure to inform the company of the "Al Nakheel opportunity," and by Fadul's taking the opportunity for himself and allowing Moutiny to continue to incur debt after the License was gone.[44]

In a reply brief, as to Counts III through VIII, appellants argue that the circuit court did not award any damages for the derivative claims, and that the circuit court "erred [in] enter[ing] judgment in Aramtel's favor on its derivative claims" without finding damages. As to Count II, appellants contend that the circuit court failed to award even "nominal contract damages" to Moutiny. Appellants assert that the "plain words and the structure" of the Memorandum Opinion, and specifically the section titled "Damages," demonstrates that the circuit court failed to find that Moutiny suffered any damages. Appellants maintain that, contrary to appellees' contention, the circuit court did not implicitly award out-of-pocket damages, "because even assuming Moutiny incurred out-of-pocket damages, such damages were impermissibly speculative."

### (2) Standard of Review

An appellate court reviews a trial court's factual findings for clear error, and reviews the trial court's legal conclusions *de novo*. *See* Md. R. 8–131(c) (An appellate court "will not set aside the judgment of [a] trial court on the evidence unless clearly erroneous, and will give due regard to the opportunity of the trial court to judge the credibility of the witnesses."); *Ramlall*, 202 Md.App. at 34, 30 A.3d 1003 ("The clearly erroneous standard does not apply to [a trial] court's legal conclusions, however, to which [an appellate court] accord[s]

---

**44.** At oral argument, appellees contended that the circuit court found in their favor as to damages on all of the derivative claims by finding that Moutiny incurred significant debt. Appellees argued that the circuit court's finding that Aramtel incurred $30,000,000 in debt—by loaning Moutiny $5,000,000 for operating expenses and another $25,000,000 for equipment—is a quantification of the debt incurred by Moutiny, and that the circuit court intended to award damages for the derivative claims based on finding $30,000,000 owed to Aramtel.

no deference and which [the appellate court] review[s] to determine whether [or not] they are legally correct."). The appellate court views the evidence in the light most favorable to the prevailing party, *MIE Props., Inc.,* 398 Md. at 676, 922 A.2d 509, and resolves all evidentiary conflicts in the prevailing party's favor. *First Union Nat'l Bank,* 154 Md.App. at 107 n. 1, 838 A.2d 404.

### (3) Law

### (a) Fraud

In *Rozen v. Greenberg,* 165 Md.App. 665, 674–75, 886 A.2d 924 (2005), *cert. denied,* 391 Md. 579, 894 A.2d 546 (2006), this Court listed the five elements of fraud as follows:

(1) the defendant made a false representation to the plaintiff,

(2) the falsity of the representation was either known to the defendant or the representation was made with reckless indifference to its truth,

(3) the misrepresentation was made for the purpose of defrauding the plaintiff,

(4) the plaintiff relied on the misrepresentation and had the right to rely on it, and

(5) the plaintiff suffered compensable injury as a result of the misrepresentation.

(Citation omitted). Stated otherwise, the fifth element requires that the plaintiff have "actually suffered damage directly resulting from such fraudulent misrepresentation." *First Union Nat'l Bank,* 154 Md.App. at 134, 838 A.2d 404 (citation omitted).[45]

---

**45.** Constructive fraud, a type of fraud, requires proof of damages. *See Crawford v. Mindel,* 57 Md.App. 111, 120, 122, 469 A.2d 454 (1984) (We held that fraud is a tort which includes "constructive as well as actual fraud[,]" and that "[o]ne suing for fraud ... must establish that he sustained damage by reason of the fraud, and that his injury was the natural and proximate consequence of his reliance on the fraudulent act." (Citations omitted)).

■ In *Goldstein,* 159 Md.App. at 422–23, 859 A.2d 313, with Judge Peter B. Krauser, now Chief Judge, speaking for the Court, we discussed the determination of damages in fraud and deceit cases as follows:

In determining the proper measure of damages in fraud and deceit cases, Maryland applies the flexibility theory. Under that theory, a victim of fraudulent or negligent misrepresentation may elect to recover either out-of-pocket expenses or benefit-of-the-bargain damages. The former will permit the plaintiff to recover his or her actual losses; the latter puts the defrauded party in the same financial position as if the fraudulent representations had in fact been true, by awarding as damages the difference between the actual value of the property at the time of making the contract and the value that it would have possessed if the representations had been true.

(Citations and internal quotation marks omitted). The flexibility theory, in turn, is based on the following four "conclusions":

(1) If the defrauded party is content with the recovery of only the amount that he actually lost, his damages will be measured under that rule;

(2) if the fraudulent representation also amounted to a warranty, recovery may be had for loss of the bargain because a fraud accompanied by a broken promise should cost the wrongdoer as much as the latter alone;

(3) where the circumstances disclosed by the proof are so vague as to cast virtually no light upon the value of the property had it conformed to the representations, the court will award damages equal only to the loss sustained; and

(4) where ... the damages under the benefit-of-the-bargain rule are proved with sufficient certainty, that rule will be employed.

*Id.* at 423, 859 A.2d 313 (citation, footnote, and internal quotation marks omitted) (omission in original). In *Goldstein, id.* at 424, 859 A.2d 313, we explained the relationship between the four conclusions as follows: "While conclusion (3) permits

the recovery of actual losses under conclusion (1) when circumstances disclosed by the proof are so vague that no value can be assigned to the property had it conformed to the representations, conclusion (4) permits the recovery of benefit-of-the-bargain damages under conclusion (2) when damages are proved with sufficient certainty." (Citation and internal quotation marks omitted).

### (b) Negligent Misrepresentation

 In *Walpert, Smullian & Blumenthal, P.A. v. Katz,* 361 Md. 645, 657, 762 A.2d 582 (2000), the Court of Appeals listed the five elements of negligent misrepresentation as follows:

(1) the defendant, owing a duty of care to the plaintiff, negligently asserts a false statement;

(2) the defendant intends that his statement will be acted upon by the plaintiff;

(3) the defendant has knowledge that the plaintiff will probably rely on the statement, which, if erroneous, will cause loss or injury;

(4) the plaintiff, justifiably, takes action in reliance on the statement; and

(5) the plaintiff suffers damage proximately caused by the defendant's negligence.

(Citation and internal quotation marks omitted). As with fraud, the flexibility theory of damages applies to negligent misrepresentation. *See Goldstein,* 159 Md.App. at 434, 859 A.2d 313.

### (c) Breach of Fiduciary Duty

 No Maryland appellate court has described the elements of breach of fiduciary duty because "[t]here is no universal or omnibus tort for the redress of breach of fiduciary duty by any and all fiduciaries." *Wasserman v. Kay,* 197 Md.App. 586, 630, 14 A.3d 1193 (2011). In *Wasserman, id.* at 631, 14 A.3d 1193 we stated, however, that "an alleged breach of fiduciary duty may give rise to a cause of action [such as

breach of contract], but it does not, standing alone, constitute a cause of action." *Id.* at 631, 14 A.3d 1193.[46]

### (d) Conversion

In *Lasater,* 194 Md.App. at 446–47, 5 A.3d 79 this Court described the two elements of conversion as follows:

> Conversion is an intentional tort, consisting of two elements, a physical act combined with a certain state of mind. It is ... any distinct act of ownership or dominion exerted by one person [*i.e.* the defendant] over the personal property of another [*i.e.* the plaintiff] in denial of his [or her] right or inconsistent with it. The act of ownership for conversion can occur either by initially acquiring the property or by retaining it longer than the rightful possessor [*i.e.* the plaintiff] permits.

(Citations and internal quotation marks omitted). Damages for conversion are measured by "the fair market value of the property at the time and place of the conversion." *Vaughn v. Vaughn,* 146 Md.App. 264, 277, 806 A.2d 787 (2002). Additionally, "[w]hen the defendant satisfies the judgment in the action for conversion, title to the chattel passes to him, so that he is in effect required to buy it at a forced judicial sale." *Id.* (citation and internal quotation marks omitted). Stated differently, "a successful action for conversion results in a forced

---

46. In *Lasater v. Guttmann,* 194 Md.App. 431, 456, 5 A.3d 79 (2010), *cert. denied,* 417 Md. 502, 10 A.3d 1181 (2011), we described breach of fiduciary duty as follows: (1) the defendant owes to the plaintiff a fiduciary duty, *i.e.* a duty "to act for the benefit of the [plaintiff] to the relation as to matters within the scope of the relation" "such as between trustee and beneficiary, guardian and ward, agent and principal, attorney and client, partners in a partnership, [or] corporate directors and their corporation," (citation and internal quotation marks omitted), (2) the defendant fails to take an action for the plaintiff's benefit as to matters within the scope of the fiduciary relationship, *id.,* and (3) the plaintiff is entitled to an appropriate remedy, as "determined by a[ ] historical analysis." *Wasserman,* 197 Md.App. at 631, 14 A.3d 1193 (citation omitted). In light of our determination that the circuit court found appellees had not proven Moutiny's damages as to any of the derivative claims, we need not address whether appellees adequately pled breach of fiduciary duty.

judicial sale of the property converted." *Wallace v. Lechman & Johnson, Inc.*, 354 Md. 622, 635, 732 A.2d 868 (1999) (citation omitted). In *Zachair, Ltd. v. Driggs*, 135 Md.App. 403, 427, 762 A.2d 991 (2000), *cert. denied*, 363 Md. 206, 768 A.2d 54 (2001), a case involving a claim of conversion of mining products, as to damages generally, we stated:

As a general rule, the evidence to warrant damages must show that the plaintiff has sustained some injury and must establish sufficient data from which the court or jury can properly estimate the extent of the damages. Damages must be proven with reasonable certainty, or some degree of specificity, and may not be based on mere speculation or conjecture.

As to the degree of certainty required, the Court of Appeals has explained:

Courts have modified the "certainty" rule into a more flexible one of "reasonable certainty." In such instances, recovery may often be based on opinion evidence, in the legal sense of that term, from which liberal inferences may be drawn. Generally, proof of actual or even estimated costs is all that is required with certainty.

(Citations omitted).

### (e) Usurpation of Corporate Opportunity and Corporate Waste

In *Shapiro v. Greenfield*, 136 Md.App. 1, 16, 764 A.2d 270 (2000), this Court described usurpation of corporate opportunity as follows:

In determining whether [or not] an opportunity is a corporate opportunity, Maryland follows the "interest or reasonable expectancy" test[, which] focuses on whether [or not] the corporation could realistically expect to seize and develop the opportunity. If so, the director or officer may not appropriate it and thereby frustrate the corporate purpose. If the opportunity is a corporate one, then the director or officer to whom it is presented or who becomes aware of it must first present it to the corporation, before

pursuing it himself [or herself]. . . . Only if the corporation rejects the opportunity may a director or officer exploit it for his [or her] own benefit. When an officer or director breaches his [or her] duty of loyalty to the corporation by usurping a corporate opportunity for his [or her] personal benefit, the corporation may claim all of the benefits of the transaction for itself.

(Omission in original) (citations and some internal quotation marks omitted).

In *Werbowsky v. Collomb*, 362 Md. 581, 610, 766 A.2d 123 (2001), the Court of Appeals described corporate waste as follows:

With respect to allegations of corporate waste, the test . . . is whether [or not] what the corporation has received is so inadequate in value that no person of ordinary, sound business judgment would deem it worth that which the corporation has paid.

(Citations and internal quotation marks omitted).

### (4) Analysis

 Returning to the instant case, after careful review of the record, we conclude that the circuit court erred in granting judgment in appellees' favor as to the derivative claims brought on Moutiny's behalf.[47] In its Memorandum Opinion, the circuit court concluded that Aramtel had proven the derivative claims brought on Moutiny's behalf, Count II through Count VIII, in addition to having proven its direct

---

**47.** In *Bender v. Schwartz*, 172 Md.App. 648, 665, 917 A.2d 142 (2007), this Court stated that "[s]ubstantively, a shareholder derivative suit is governed by the law of the state of incorporation." (Citation omitted). Although Moutiny is incorporated in the United Arab Emirates, the April Operating Agreement specifically provides in Section 14.5 that the Agreement "shall be governed by and construed in accordance with the laws of the State of Maryland[.]" Additionally, appellants raise no issue before this Court that United Arab Emirates law should apply. Rather, appellants rely on and use case law from Maryland in support of its contentions concerning the merits of the derivative claims. Accordingly, we shall apply Maryland law in our review of the derivative claims.

claim for fraudulent inducement, Count I. In assessing damages, however, the circuit court ruled that, although Aramtel had proven its damages, Aramtel failed to prove damages on Moutiny's behalf, stating:

> In determining the proper measure of damages in fraud and deceit cases, Maryland applies the "flexibility theory." ... Under this "flexibility theory", a victim of fraudulent or negligent misrepresentation may elect to recover "out-of-pocket" expenses or "benefit-of-the-bargain" damages. Moutiny was deprived the benefit of its bargain as a result of Fadul's fraudulent scheme and many violations of his contractual and fiduciary duties. Because the future profits of Moutiny are unknown, this Court will not [o]rder damages based on the loss of ownership of the WLL license, the lost profits or the benefits Fadul received from the Al Nakheel opportunity. While Moutiny may have successfully deployed the WLL network in Iraq if it had the WLL license, it still may have failed for numerous other reasons. Because [appellees] cannot prove Moutiny's profits with certainty, this Court cannot make a determination as to the potential damages.

(Emphasis added). The circuit court erred in entering judgment in appellees' favor as to the derivative claims without finding damages, a required element for all of the causes of action alleged as derivative claims on Moutiny's behalf in appellees' first amended counterclaim. *See, e.g., Rozen*, 165 Md.App. at 675, 886 A.2d 924 (An element of fraud is that the plaintiff suffered compensable injury as a result of the misrepresentation.); *Brass Metal Prods. v. E–J Enters.*, 189 Md. App. 310, 360, 984 A.2d 361 (2009) ("Constructive fraud ... injure[s] ... interests." (Citation omitted)); *Katz*, 361 Md. at 657, 762 A.2d 582 (Negligent misrepresentation requires that "the plaintiff suffer[ ] damage proximately caused by the defendant's negligence."); *Vaughn*, 146 Md.App. at 277, 806 A.2d 787 (Damages for conversion are measured by "the fair market value of the property at the time and place of the conversion."); *Shapiro*, 136 Md.App. at 16, 764 A.2d 270 (Where an officer or director usurps a corporate opportunity

for his or her personal benefit, "the corporation may claim all of the benefits of the transaction for itself" as damages.); *Werbowsky*, 362 Md. at 610, 766 A.2d 123 (Corporate waste, by definition, results from an amount "which the corporation has paid." (Citation and internal quotation marks omitted)).[48]

To be sure, the circuit court remarked that Moutiny had been deprived of the benefit of its bargain. The circuit court clearly found, however, that it could not make a determination as to Moutiny's potential damages, as Moutiny's profits were speculative and uncertain and as Moutiny "may have failed for numerous other reasons" aside from Fadul's tortious acts. The circuit court rejected several possible theories of damages incurred by Moutiny, stating that it would not order damages based on loss of the License, lost profits, or benefits Fadul received from Al Nakheel. We stated that damages generally "must be proven with reasonable certainty, or some degree of specificity, and may not be based on mere speculation or conjecture[,]" *Zachair, Ltd.*, 135 Md.App. at 427, 762 A.2d 991 (citation omitted), and that benefit-of-the-bargain damages under the flexibility theory, specifically, must be proven with "sufficient certainty[.]" *Goldstein*, 159 Md.App. at 424, 859 A.2d 313 (citation omitted). Despite its clear finding that it could not make a determination as to damages incurred by Moutiny—*i.e.* that Moutiny's damages were speculative and uncertain-the circuit court entered judgment in favor of appellees on the derivative claims.

As to appellees' claim that the circuit court intended the $30,000,000 in damages found for Aramtel to be assessed as damages on the derivative claims, the record demonstrates that the circuit court simply did not make this finding. Although appellees urge that when read as a whole, the circuit court's opinion leads to the conclusion that the court intended the $30,000,000 in damages to be assessed as to Count I,

---

**48.** Additionally, as to Count VI, breach of fiduciary duty, we note that "an alleged breach of fiduciary duty ... does not, standing alone, constitute a cause of action." *Wasserman*, 197 Md.App. at 631, 14 A.3d 1193. Thus, the circuit court erred in treating the claim of breach of fiduciary duty as a distinct cause of action.

fraudulent inducement, and as to the derivative claims, an award of damages must not be based on speculation. Interpreting the circuit court's opinion in the manner argued by appellees directly contradicts the circuit court's statement that it could not make a determination as to damages for Moutiny. *Zachair, Ltd.*, 135 Md.App. at 427, 762 A.2d 991 (Damages "may not be based on mere speculation or conjecture.") (citation omitted). Based on this record, we have no difficulty in concluding that the circuit court erred in granting judgment in favor of appellees as to the derivative claims, Counts II through VIII.[49]

**JUDGMENT OF THE CIRCUIT COURT FOR HOWARD COUNTY AS TO COUNT I, FRAUDULENT INDUCEMENT, AFFIRMED. AWARD OF $45,089,392.81, PLUS INTEREST, AFFIRMED. ALL OTHER JUDGMENTS, COUNT II THROUGH COUNT VIII (DERIVATIVE CLAIMS ON MOUTINY'S BEHALF), VACATED. COSTS TO BE PAID 3/4 BY APPELLANTS AND 1/4 BY APPELLEES.**

---

**49.** Although we conclude the circuit court erred in granting judgment in favor of appellees as to the derivative claims, we need not and do not vacate the award in the amount of $45,089,392.81, plus interest, ordered in favor of Aramtel for Count I, fraudulent inducement. Indeed, as appellants acknowledge in their reply brief, the "total award [outlined in the Memorandum Opinion] is that sum of Aramtel's award for Count I, plus interest on that amount." We are satisfied, therefore, that the circuit court properly awarded damages to Aramtel for Count I, as outlined in Part I, *supra*.